A-1

**STATE of Delaware,**

v.

Michael CHANDLER, Defendant.

ID No. 1405005374

Superior Court of Delaware,
IN AND FOR NEW CASTLE
COUNTY.

Submitted: March 23, 2015
Decided: April 2, 2015
Corrected: April 14, 2015

Zachary Rosen, Esquire, Deputy Attorney General, Wilmington, DE, Attorney for the State.

Natalie S. Woloshin, Esquire, Wilmington, DE, Attorney for the Defendant.

## OPINION

JURDEN, P.J.

## I. INTRODUCTION

Before the Court is the defendant's Motion to Suppress. For the reasons that follow, the defendant's motion is **GRANTED**.

## II. FACTS

On May 7, 2014, Trooper Matthew Radcliffe of the Delaware State Police was conducting a routine traffic patrol in an unmarked patrol vehicle on Delaware Route 1 in New Castle County, Delaware.[1] At 3:47 p.m., Trooper Radcliffe observed a 2014 black Dodge Charger bearing a Pennsylvania license plate traveling 48 miles per hour in a 25 miles per hour zone. Trooper Radcliffe activated the emergency equipment on his patrol vehicle and conducted a motor vehicle stop on the right shoulder of Route 1.[2] As Trooper Radcliffe approached the vehicle on the passenger side, he observed the defendant, Michael Chandler, as the driver and sole occupant. According to Trooper Radcliffe, Chandler appeared extremely nervous. Trooper Radcliffe told Chandler that he was speeding and asked for his license, insurance, and registration. As Chandler produced the requested documents,[3] Chandler's hands were visibly shaking, his chest was moving up and down due to his heavy breathing, he avoided eye contact, and he fumbled with his license. Trooper Radcliffe asked Chandler about his trip. Chandler hesitantly stated that he was from Philadelphia and was headed to Virginia to see family. Trooper Radcliffe did not ask any further questions about Chandler's travels. Trooper Radcliffe testified that he saw four cell phones scattered throughout the center console of Chandler's vehicle.

---

1. Trooper Radcliffe was specifically patrolling for motor vehicle violations such as operators using a handheld electronic device, seatbelt violators, registration violations, equipment violations, and vehicles exceeding the posted 25 miles per hour speed limit.

2. A video from Trooper Radcliffe's dash board camera recorded the traffic stop.

3. Chandler produced his Pennsylvania driver's license and documentation for the vehicle, including a rental agreement.

Following this interaction, Trooper Radcliffe returned to his vehicle to call for backup assistance and conduct routine computer checks. Trooper Radcliffe called for backup because Chandler was so nervous.[4] While waiting for backup, Trooper Radcliffe conducted a routine computer check which indicated that Chandler's license was valid and that the vehicle was rented under the name of Michael Chandler.

Approximately 18 minutes after the initial stop, Trooper Macauley of the Delaware State Police arrived as backup. Immediately upon arrival, Trooper Radcliffe and Trooper Macauley discussed the circumstances of the traffic stop. Trooper Radcliffe told Trooper Macauley that Chandler's hands were shaking a lot when he reached for his wallet, he was driving a rental vehicle, he was from Philadelphia and going to visit family in Virginia, and that he had an alias of "Robert Page." Trooper Macauley asked Trooper Radcliffe if there were "any air fresheners or anything," and Trooper Radcliffe said he did not see any. At that point, Chandler's criminal history check came back showing that Chandler had an extensive criminal history, including weapons and drug trafficking charges. Trooper Radcliffe cautioned Trooper Macauley, "be careful, he is so nervous it is making me nervous," before they both approached the defendant's vehicle. Trooper Radcliffe approached on the driver's side of the vehicle and Trooper Macauley approached on the passenger side. Trooper Radcliffe asked Chandler to exit the vehicle and asked to see Chandler's hands as he was exiting. Trooper Radcliffe told Chandler to stand at the left rear of the vehicle. Trooper Radcliffe asked Chandler if he had any weapons and

Chandler responded "No." Trooper Radcliffe advised Chandler he was going to conduct a pat down for officer safety. Trooper Radcliffe patted down Chandler and found no weapons.

After completing the pat down, both officers stood with Chandler behind the vehicle. Trooper Radcliffe told Chandler that he was pulled over for speeding and asked, "what is up with the two names, do you have another name?" When Chandler responded "uhh," Trooper Radcliffe asked, "how about Page, is that you as well?" Chandler responded, "Yes." Trooper Radcliffe asked Chandler what his real name was, and he responded "Michael Chandler." Again, Trooper Radcliffe inquired about the name of "Page" and Chandler replied, "that was an alias." Trooper Radcliffe then asked, "so Page is an alias and Chandler is your real name?" Chandler responded, "Yes."

Trooper Radcliffe asked Chandler why he was so nervous in his vehicle and Chandler said there was no reason. Trooper Radcliffe again inquired about the name of "Page," and asked Chandler when he last used the name "Page." Chandler explained that the last time he used the name Page was in 1998. Trooper Radcliffe asked Chandler how long he has used the name "Chandler," and Chandler answered, "all my life." In response to more questioning, Chandler admitted that he had been in trouble with the law in the past under the name of Page. Trooper Radcliffe asked Chandler, "is anything illegal in the vehicle that you tend to travel with like guns, drugs, knives, bombs, used currency, anything crazy like that?" Chandler responded, "No." Trooper Radcliffe continued questioning Chandler as follows:

4. Trooper Radcliffe testified that, based on his training and experience, Chandler's level of nervousness was higher than the average nervousness of a law abiding citizen during a routine traffic stop.

**Trooper Radcliffe:** Do you mind if I check real quick to get you on your way?

**Chandler:** No I don't—I don't—I do mind.

**Trooper Radcliffe:** You do mind?

**Chandler:** Because I was pulled . . .

**Trooper Radcliffe:** [inaudible]

**Chandler:** I do mind because I'm getting pulled over for speeding [gestures towards his vehicle] . . .

**Trooper Radcliffe:** Okay.

**Chandler:** and now that—

**Trooper Radcliffe:** Well I've just explained all those—the two names, the nervousness, and all that—all that stuff alright—

**Chandler:** I'm not nervous.

**Trooper Radcliffe:** —makes me suspicious alright and that's the reason why I am asking.

**Chandler:** I'm not nervous.

**Trooper Radcliffe:** So I'm—I'm respecting you, okay? I want to know if I have your right—your consent for me to look in your vehicle due to all the stuff I explained to you?

**Chandler:** No sir.

**Trooper Radcliffe:** No? Okay.

**Chandler:** Because I'm on my way to go see my family—

**Trooper Radcliffe:** Uh huh.

**Chandler:** I've been in trouble in 1998—

**Trooper Radcliffe:** Okay.

**Chandler:** and now I'm being pulled over—

**Trooper Radcliffe:** Okay.

**Chandler:** for something in 1998—

**Trooper Radcliffe:** Okay.

**Chandler:** Do you understand what I'm saying? I get—I got—

**Trooper Radcliffe:** Simple question. Yes or no. You are saying no?

**Chandler:** No. Yes.

**Trooper Radcliffe:** Alright have a seat in your vehicle, I'll be right with you okay.

As Chandler returned to his vehicle (as instructed by Trooper Radcliffe) and began to open the driver's door, Trooper Macauley stopped Chandler and directed him to stand by the rear passenger side tire. Meanwhile, Trooper Radcliffe returned to his patrol vehicle and called for a narcotic canine unit ("K9").

As Chandler leaned back against his vehicle, Trooper Macauley began to question him. After about two and a half minutes, Chandler turned around, faced his vehicle, folded his arms, and leaned on the trunk. Trooper Macauley turned his back to Chandler and walked toward Trooper Radcliffe's patrol vehicle. For about 2 minutes, with his back still to Chandler, Trooper Macauley informed Trooper Radcliffe that Chandler had no idea where he was going in Virginia. Trooper Macauley explained that Chandler said he was going to Norfolk, Virginia to visit his cousin but could not provide the cousin's name or say if the cousin was male or female. Trooper Macauley told Trooper Radcliffe that he told Chandler, "you are nervous—you have no valid answer to any of the questions—[inaudible] so we are just going to call the K9 now."

Trooper Radcliffe then confirmed with dispatch that Trooper Nicholas Ronzo was on the way with his K9 partner. Trooper Macauley re-approached Chandler and stood next to him. Chandler remained leaning on the trunk. Several minutes later, Trooper Radcliffe approached Chandler and the following exchange occurred:

**Trooper Radcliffe:** Alright man, gonna let you know what is going on alright. We have a narcotic K9 coming. [inaudible] Okay? Why you sweating?

**Chandler:** ... I'm being asked a whole bunch of questions and it don't make no sense ...

**Trooper Radcliffe:** Okay.

**Chandler:** you pulled me over for speeding ...

**Trooper Radcliffe:** Okay.

**Chandler:** [inaudible]—and now you trying to make it something else—

**Trooper Radcliffe:** Alright look I'm just trying to be respectful. I'm letting you know what's going on okay. It is what it is. Alright?

**Chandler:** [*nods head*]

**Trooper Radcliffe:** When was your last criminal charge?

**Chandler:** I choose not to answer no more questions.

**Trooper Radcliffe:** Huh?

**Chandler:** I choose not to answer no more questions.

**Trooper Radcliffe:** You choose not to answer any more questions? Okay.

**Chandler:** You know everything like—[gestures toward patrol vehicle]—I mean everything—you know—

**Trooper Radcliffe:** Alright well you had conflicting statements to me okay and I'm just trying to make sense of it. That's all.

**Chandler:** It's not conflicting. You pulled me over—

**Trooper Radcliffe:** Look I'm not—I'm not here to debate with you—I'm just telling you. Okay. If you don't want to speak any further that's fine. Alright.

Trooper Radcliffe then returned to his patrol vehicle and Chandler remained leaning on the trunk with his arms folded. While waiting for the K9 to arrive, the officers had several conversations next to the patrol vehicle. Despite the fact that Chandler remained in the same position, Trooper Macauley said, "I honestly think he is going to run." Trooper Radcliffe responded, "I do too." One of the officers then said, "he tried getting back in the car." At that point, the officers placed a tire strip under the rear right tire.

■ Approximately 40 minutes after the initial traffic stop, Trooper Radcliffe approached Chandler and explained that the K9 "is crazy" so Chandler needed to stand behind the patrol vehicle. Trooper Radcliffe asked Chandler who he was going to visit in Virginia, and Chandler said he did not want to answer any more questions. When Trooper Ronzo arrived, his K9 partner gave a positive indication for the odor of controlled substances coming from the vehicle. A search of the vehicle revealed heroin and cocaine in the trunk.

## III. STANDARD OF REVIEW

On a motion to suppress evidence seized during a warrantless search or seizure, the State bears the burden of establishing that the challenged search or seizure comported with the rights guaranteed by the United States Constitution, the Delaware Constitution, and Delaware statutory law.[5] The burden of proof on a motion to suppress is proof by a preponderance of the evidence.[6]

## IV. PARTIES' CONTENTIONS

Chandler moves to suppress all evidence obtained by the State as a result of the

---

5. *Hunter v. State,* 783 A.2d 558, 560 (Del. 2001) ("Despite some arguable earlier confusion in the Delaware case law over which party bears the burden of proof on a motion to suppress evidence seized during a *warrantless* search, the rule in Delaware should now be clear. The State bears the burden of proof.").

6. *State v. Abel,* 2011 WL 5221276, at *2 (Del. Super. 2011), *aff'd,* 68 A.3d 1228 (Del. 2012), *as amended* (Jan. 22, 2013).

May 7, 2014, roadside detention and subsequent search of his vehicle. Chandler maintains that once Trooper Radcliffe ascertained that Chandler possessed valid driving credentials, a speeding citation should have been issued and Chandler should have been released. Instead, Trooper Radcliffe improperly extended the duration and scope of the initial detention in violation of the Fourth Amendment of the United States Constitution and Article 1, Section 6 of the Delaware Constitution.

The State concedes that the investigation was extended beyond the traffic stop, but argues that the police had reasonable, articulable suspicion of criminal activity sufficient to justify expanding the detention to wait for a K9 to arrive.

## V.  DISCUSSION

■ The Fourth and Fourteenth Amendments of the United States Constitution,[7] and Article I, Section 6 of the Delaware Constitution,[8] protect individuals from unreasonable searches and seizures. Under the Fourth Amendment, a traffic stop by the police is a "seizure" of the vehicle and its occupants.[9] Consequently, a traffic stop must be justified at its inception by a reasonable suspicion of criminal activity, and the scope of the stop must be reasonably related to the stop's initial purpose.[10]

■ A police officer who observes a traffic violation has probable cause to stop the vehicle and its driver, however, "[t]he scope and duration of the detention must be reasonably related to the initial justification for the stop."[11] In other words, the scope of the detention must be carefully tailored to its underlying justification.[12] Further, the detention must be temporary and last no longer than reasonably necessary to effectuate the purpose of the stop, at which point the legitimate investigative purpose of the traffic stop is completed.[13] "[A]ny investigation of the vehicle or its occupants beyond that required to complete the purpose of the traffic stop constitutes a separate seizure that must be supported by independent facts sufficient to justify the additional intrusion."[14]

■ If the police prolong a suspect's road side detention in order to investigate other possible crimes, it becomes a second detention.[15] The second detention is unconstitutional unless it is based on specific and articulable facts which, taken together with all rational inferences, raised an ob-

7. U.S. CONST. amend IV, XIV.

8. DEL. CONST. art. I, § 6.

9. *Caldwell v. State*, 780 A.2d 1037, 1045 (Del. 2001) (citing *United States v. Brignoni–Ponce*, 422 U.S. 873, 880–81, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975)).

10. *Id.* at 1046–47. Delaware has codified the *Terry v. Ohio* standard for investigatory stops and detentions in 11 *Del. C.* § 1902. Pursuant to § 1902, "[a] peace officer may stop any person abroad, or in a public place, who the officer has reasonable ground to suspect is committing has committed or is about to commit a crime, and may demand the person's name, address, business abroad and

destination." The term "reasonable ground" has the same meaning as "reasonable and articulable suspicion." *Cummings v. State*, 765 A.2d 945, 948 (Del. 2001).

11. *Holden v. State*, 23 A.3d 843, 847 (Del. 2011).

12. *State v. Miliany–Ojeda*, 2004 WL 343965, at *3 (Del. Super. 2004) (citing *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)).

13. *Id.* (citing *Caldwell*, 780 A.2d at 1046–50).

14. *Caldwell*, 780 A.2d at 1047.

15. *Id.*

jective suspicion of criminal behavior.[16]

Reasonable suspicion must be based upon more than a hunch.[17] Delaware courts define reasonable suspicion as an "officer's ability to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion."[18] A determination of reasonable suspicion "must be evaluated in the context of the totality of the circumstances as viewed through the eyes of a reasonable, trained police officer in the same or similar circumstances, combining objective facts with such an officer's subjective interpretation of those facts."[19] "The Court must judge the facts under an objective standard and, thus, a police officer's subjective opinion that suspicious circumstances are ongoing is insufficient."[20]

### A. Initial Traffic Stop & Pat Down

■ In this case, the initial traffic stop constituted a seizure of Chandler for Fourth Amendment purposes, but the seizure was supported by probable cause because Trooper Radcliffe detected Chandler driving at 48 miles per hour in a 25 miles per hour zone.

■ Having determined that the stop was lawful, the Court must next address whether the detention was reasonably related in scope and duration to the initial justification for the stop. During a traffic stop, the police may request the occupants of a car to the exit the vehicle.[21] Recognizing the importance of officer safety during a traffic stop, a police officer may protect himself by patting down the suspect.[22] However, "in order to justify a pat down, an officer must have reasonable, articulable suspicion that the person is presently armed and dangerous."[23] The officer must "point to specific and articulable facts which, taken together with all rational inferences from those facts, reasonably warrant the intrusion."[24] Generally, "a pat down is justified based on the nature of the suspected crime, a sudden reach by the individual, a bulge, or a history with the specific individual."[25]

In *Monroe v. State*, the Delaware Supreme Court held that the defendant's prior criminal history, by itself, was insufficient to establish reasonable articulable suspicion.[26] However, in *Monroe*, that history, coupled with the defendant's nervous demeanor and refusal to answer the officer's question, was sufficient to establish the necessary reasonable, articulable suspicion to conduct a pat down.[27]

■ In the present case, under the totality of the circumstances, the Court

16. *Cummings*, 765 A.2d at 948.

17. *State v. Huntley*, 777 A.2d 249, 255 (Del. Super. 2000).

18. *Holden*, 23 A.3d at 847 (Del. 2011) (citing *State v. Henderson*, 892 A.2d 1061, 1064–1065 (Del. 2006)).

19. *Id.* (citing *Jones v. State*, 745 A.2d 856, 861 (Del. 1999)).

20. *Miliany–Ojeda*, 2004 WL 343965, at *3 (citing *Harris v. State*, 806 A.2d 119 (Del. 2002)).

21. *Loper v. State*, 8 A.3d 1169, 1174–75 (Del. 2010) (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977)).

22. *Holden*, 23 A.3d at 849.

23. *State v. Abel*, 68 A.3d 1228, 1233 (Del. 2012), *as amended* (Jan. 22, 2013).

24. *Holden*, 23 A.3d at 847 (quoting *Henderson*, 892 A.2d at 1064–65).

25. *Id.* at 850.

26. *Monroe v. State*, 913 A.2d 570, 2006 WL 3482182, at *2 (Del. 2006) (TABLE).

27. *Id.*

finds that Trooper Radcliffe had reasonable, articulable suspicion that Chandler was armed and presently dangerous based on Chandler's extreme nervousness, lack of eye contact, extensive narcotics and weapons criminal history, alias, and use of a rental vehicle. Therefore, the traffic stop was reasonably expanded to conduct a pat down for weapons to ensure officer safety.

Trooper Radcliffe testified that he typically does not call for backup assistance during routine traffic stops, but he did so in this instance because based on his training and experience, Chandler exhibited more nervousness than that of an average person during a traffic stop. According to Trooper Radcliffe, Chandler's hands were visibly shaking, his chest was visibly moving due to his heavy breathing, he avoided eye contact, and he fumbled with his license. After running routine computer checks, Trooper Radcliffe found a discrepancy in Chandler's identification because of an apparent alias. Trooper Radcliffe also discovered that Chandler had an extensive criminal history that included a weapons charge. Trooper Radcliffe waited for backup to arrive before re-approaching Chandler and told Trooper Macauley to be careful because Chandler's nervousness was making him nervous. Thus, the circumstances justified a pat down for the limited purpose of officer safety.

## B. Duration and Scope of the Traffic Stop

■ As discussed above, the duration and scope of the traffic stop must last only as long as reasonably necessary to effectuate the purpose of the stop, at which point the legitimate investigative purpose of the traffic stop is completed.[28] During a traffic stop, 11 *Del. C.* § 1902 permits police to question a driver about his identity, where he is coming from, where he is going, and the reason for his trip, and these questions are not beyond the scope of a reasonable investigation. Thus, the valid traffic stop for speeding permitted certain investigative actions, including a check of Chandler's driving credentials, criminal background check, and inquiries as to his name, address, and destination.[29] It was not unlawful for Trooper Radcliffe to ask follow up questions about Chandler's nervousness or prior use of an alias in an effort to confirm or dispel his suspicions.[30]

■ That being said, however, an officer's inquiries are not limitless. During a traffic stop, an officer is not entitled "to conduct an unrelated criminal investigation absent some other criminal suspicion."[31] According to the Delaware Supreme Court, "an officer's observation of a traffic violation does not confer the right to abandon or never begin to take action related to the traffic laws and, instead, to attempt to secure a waiver of Fourth Amendment rights...."[32] Generally, once the officer has issued a citation or warning, the vehicle must be released.[33] And, even if "the traffic stop is not formally terminated by the issuance of a citation or warning, the legitimating *raison d'etre*

28. *Caldwell,* 780 A.2d at 1046–50.

29. *See Loper,* 8 A.3d at 1173 (holding that asking a passenger questions about his identity and running a background check are not beyond the scope of a routine traffic stop).

30. *Huntley,* 777 A.2d at 255 (citing *Berkemer v. McCarty,* 468 U.S. 420, 439–40, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)); 11 *Del. C.* § 1902(b).

31. *Jenkins v. State,* 970 A.2d 154, 158 (Del. 2009).

32. *Caldwell,* 780 A.2d at 1048.

33. *Id.* at 1047.

of the stop may evaporate if its pursuit is unreasonably attenuated or allowed to lapse into a state of suspended animation." [34] Accordingly, the Court must conduct a fact-intensive inquiry in each case to determine whether a given detention is "unreasonably attenuated." [35]

In *Arizona v. Johnson*, the United States Supreme Court held that "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." [36] Although questions unrelated to the initial justification for the stop might not *per se* require reasonable suspicion or consent to further question, the Delaware Supreme Court has made clear that such inquiries must not measurably extend the duration of the stop.[37]

■ Here, once Trooper Radcliffe asked Chandler if there was any contraband in his vehicle, the traffic stop was extended into an investigative detention that exceeded the justifying purpose of the stop (i.e. speeding). At this point, the traffic stop ended and it became a second

detention that was required to be based on specific and articulable facts which, taken together with all rational inferences, raise an objective suspicion of criminal behavior.[38]

Applying this standard, the Court concludes that the purpose and justification for the traffic stop ended when Trooper Radcliffe asked Chandler if there was any contraband in his vehicle, and the police prolonged the traffic stop solely to investigate other possible crimes.

## C. Constitutionality of the Extended Detention

Because the traffic stop was extended, the question thus becomes whether Trooper Radcliffe had reasonable suspicion that Chandler had committed, was committing, or was about to commit a crime to justify prolonging the traffic stop until the K9 arrived. The State argues that reasonable suspicion existed because Chandler had multiple cell phones in plain view, gave inconsistent answers, was unable to provide details about his destination, was extremely nervous, had an alias, had an extensive criminal history, and was driving a rental vehicle.

---

34. *Id.* at 1048.

35. *Id.*

36. *Arizona v. Johnson*, 555 U.S. 323, 325, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009).

37. *Murray v. State*, 45 A.3d 670, 675 (Del. 2012), *as corrected* (July 10, 2012) ("for something to be measurable it need not be large. . . .").

38. *Cummings*, 765 A.2d at 948. In *Pierce v. State*, the Delaware Supreme Court held that an officer's question about whether there was any contraband in the vehicle during a traffic stop did not constitute a second investigative detention because the trial court found that it was a question the officer routinely asked as part of a traffic stop. 19 A.3d 302 (Del. 2011). The present case is distinguishable. In *Pierce*, the officer asked the occupants of the vehicle if they had any contraband only a few minutes after the initial traffic stop and contemporaneously with other routine questions about the occupants' identification and travels. The occupants were still in the vehicle and the officer had not yet returned to his patrol vehicle to run routine computer checks. In the instant case, Trooper Radcliffe's additional inquiry about whether there was any contraband in the vehicle did not occur while Trooper Radcliffe was conducting routine questioning. Rather, this question occurred approximately twenty three minutes after the initial stop—after Trooper Radcliffe had already conducted routine computer checks, conducted a pat down, and asked questions about the defendant's identification, destination, and nervous demeanor.

A careful review of the traffic stop video does not support the State's argument that Chandler's multiple cell phones, inconsistent answers, or inability to provide details about his trip formed the basis of Trooper Radcliffe's reasonable suspicion. Only those facts known to a police officer prior to a seizure may be part of the reasonable suspicion analysis.[39] The reasonableness of official suspicion must be measured by what the officer knew *before* they seized the defendant.[40] "An illegal stop cannot be justified by circumstances that arose after its initiation."[41]

During Trooper Radcliffe's conversation with Trooper Macauley when Trooper Macauley first arrived at the scene, Trooper Radcliffe never mentioned that he observed multiple cell phones in Chandler's vehicle, and Trooper Radcliffe never mentioned or questioned Chandler about having multiple cell phones.[42]

The State maintains that Chandler's inconsistent answers and inability to provide details about his trip were part of the reasonable suspicion analysis. But the officers did not begin to question Chandler about the details of his trip to Virginia until *after* the subsequent detention had already begun. During Trooper Radcliffe's initial conversation with Chandler, he asked Chandler where he was going, and Chandler replied that he was going to Virginia to visit family. At no point, however, did Trooper Radcliffe request more information from Chandler regarding his trip to Virginia. After Trooper Radcliffe asked Chandler for consent to search the vehicle, Trooper Radcliffe returned to his patrol vehicle and called for a K9. It was at this time that Trooper Macauley directed Chandler to stand next to the vehicle and Chandler allegedly gave inconsistent answers in response to questions about his trip.

Contrary to the State's argument, the evidence shows that Trooper Radcliffe did not know Chandler had multiple cell phones until *after* the K9 arrived and the vehicle was searched. Likewise, any inconsistent answers were elicited *after* the traffic stop ended and the subsequent detention had begun. Because subsequently obtained evidence is not permitted to justify a prior seizure and search, these factors cannot be part of the totality of the circumstances supporting the subsequent detention.

The question is whether, under the totality of the circumstances, Trooper Radcliffe possessed a reasonable articulable suspicion that criminal activity was afoot based on Chandler's: (1) extreme nervousness; (2) prior use of an alias; (3) criminal history; and (4) use of a rental vehicle.

It is not unusual for a motorist to exhibit signs of nervousness when confronted by a law enforcement officer. Delaware courts have consistently held that "inconsistent answers and nervousness without some

**39.** *Jones v. State,* 745 A.2d 856, 874 (Del. 1999).

**40.** *Id.* ("If an officer attempts to seize someone before possessing reasonable and articulable suspicion, that person's actions stemming from the attempted seizure may not be used to manufacture the suspicion the police lacked initially.").

**41.** *Woody v. State,* 765 A.2d 1257, 1263 (Del. 2001).

**42.** *See supra* Part II. After Trooper Radcliffe conducted the pat down, he only followed up with questions about Chandler's alias and nervousness. Further, when Trooper Radcliffe asked for permission to search the vehicle his stated reasoned was because Chandler's two names and nervousness made him suspicious. There was no mention of multiple cell phones.

other more tangible, objectively articulable indicators of criminality, such as driving with a suspended license, failure to provide proof of ownership of vehicle, or the palpable odor of alcohol, drugs or [masking agents], do not support a finding of reasonable suspicion." [43] While a person's nervous behavior may be relevant, generally courts are "wary of the objective suspicion supplied by generic claims that a [d]efendant was nervous or exhibited nervous behavior after being confronted by law enforcement officials." [44]

According to Trooper Radcliffe, after he conducted a pat down for officer safety and found no weapons, Chandler was still extremely nervous. Trooper Radcliffe testified that Chandler began to sweat profusely and became so nervous that he was stuttering his words. Trooper Radcliffe's testimony about Chandler's extreme nervousness is undermined by the video, which shows that Chandler was fully cooperative with Trooper Radcliffe, answered all of Trooper Radcliffe's questions responsively, and was not acting in an evasive manner. After Trooper Radcliffe asked for consent to search the vehicle, Chandler can be seen wiping sweat from his forehead; however, this occurred *after* the traffic stop was extended and, therefore, is not properly part of the Court's analysis.

Furthermore, after Trooper Radcliffe conducted the pat down, the video shows that officer safety was no longer a concern. When Chandler refused to consent to a search of the vehicle, Trooper Radcliffe

told Chandler to get back in his car. Trooper Macauley, however, directed him to stand by the vehicle. The officers left Chandler alone multiple times with their backs turned, and Chandler remained in the exact same position, obeyed all of the officer's orders, and never attempted to flee.

The Court also finds the reasonableness of any suspicion associated with Chandler's prior use of an alias to be minimal under the totality of the circumstances. [45] With regards to the alias, Chandler had a valid license and rental agreement under the name of Michael Chandler, not his prior alias of "Robert Page." Trooper Radcliffe repeatedly questioned Chandler about the alias and Chandler provided a consistent and reasonable answer—that he had been in trouble in the past using the alias of Page but had not used it since 1998. There is no evidence that any of this information was untruthful.

■ An officer's knowledge of a driver's criminal history can be a factor when determining whether an officer has reasonable suspicion to detain an individual. [46] However, such history, by itself, is insufficient to establish reasonable suspicion. [47] Chandler admitted that he had been in trouble with the law in the past, was not evasive, and there is no evidence that he provided any untruthful answers. Rather, Chandler was candid about his prior criminal history and stated multiple times that it seemed like he was being detained because of his criminal history. Chandler's

43. *Miliany–Ojeda*, 2004 WL 343965, at *6 (citing *Huntley*, 777 A.2d at 256).

44. *Id.* at *5 (quoting *United States v. Jones*, 269 F.3d 919, 928–29 (8th Cir. 2001)).

45. *See e.g.*, *United States v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (finding reasonable suspicion based on unusual travel plans, traveling under an alias, defendant paid $2,100 for two round-trip tickets

from a roll of $20 bills, and defendant stayed in Miami for only forty-eight hours, even though the trip from Honolulu to Miami took twenty hours).

46. *Monroe*, 913 A.2d 570, 2006 WL 3482182, at *2.

47. *Id.*

criminal history is just one of many factors the Court must examine.[48]

Courts that have cited nervousness, criminal history, and/or use of a rental vehicle, "as factors supporting a finding of reasonable suspicion have done so only in conjunction with other more tangible, objectively articulable indicators of criminality."[49] For example, in *United States v. Finke*, the use of a rental vehicle and prior criminal history was coupled with other compelling suspicious behavior to support

**48.** *See e.g., United States v. Martinez*, 168 F.3d 1043 (8th Cir. 1999) (finding reasonable suspicion where defendant was nervous, occupants of the car gave police inconsistent answers, driver produced an incomplete bill of sale instead of registration, and a computer check indicated criminal history); *United States v. Palomino*, 100 F.3d 446, 448 (6th Cir. 1996) (finding reasonable suspicion based on occupants' inconsistent stories about the ownership of the car and the purpose of the trip, nervousness of the occupants, driver's criminal record, and the odor of chemicals associated with cocaine); *United States v. McRae*, 81 F.3d 1528 (10th Cir. 1996) (brief detention following traffic stop lawful in light of driver's vague rental car arrangements, intensity with which driver watched officer through mirror, driver's record of drug-trafficking arrests, and untruthful answer to officer's question about criminal record).

**49.** *Huntley*, 777 A.2d at 256 ("The majority of courts that have cited tandem driving, conflicting stories, and/or general nervousness as factors supporting a finding of reasonable suspicion have done so only in conjunction with other more tangible, objectively articulable indicators of criminality....."). *Compare United States v. Beck*, 140 F.3d 1129 (8th Cir. 1998) (finding no reasonable suspicion based on defendant driving a rental car rented by an absent third party, fast food trash on the passenger side floorboard, no visible luggage apparent in the passenger compartment of the car, nervousness, traveling from a drug source state to a drug demand state, and officer's disbelief that the defendant's real reason for the trip was to find work as a truck driver in North Carolina); *United States v. Wood*, 106 F.3d 942 (10th Cir. 1997) (finding no reasonable suspicion based on use of a rental vehicle, defendant's error in identifying the city where he rented the car, fast food wrappers and open maps in the passenger compartment, extreme nervousness, and prior narcotics conviction); *Lilley v. State*, 362 Ark. 436, 208 S.W.3d 785, 792 (2005) (no reasonable suspicion to detain defendant for a canine sniff based on defendant's nervousness,

car smelled like air freshener, rental agreement was for one-way travel, and car was rented in another person's name, although the defendant was listed as an additional driver); *State v. Washington*, 623 So.2d 392 (Ala. Crim. App. 1993) (finding no reasonable suspicion where defendant was nervous, defendant had temporary license, and car was rented by third party and had temporary license plate), *with United States v. Fuse*, 391 F.3d 924 (8th Cir. 2004) (finding reasonable suspicion where there was a strong odor of air freshener, criminal history, vehicle did not belong to defendant or his passenger, unusual travel plans, nervousness); *United States v. Williams*, 271 F.3d 1262, 1271 (10th Cir. 2001) (finding reasonable suspicion based on extreme nervousness, the presence of the short-range radio, and discrepancy in the rental agreement); *U.S. v. Hill*, 195 F.3d 258 (6th Cir. 1999) (finding reasonable suspicion existed where driver and passenger gave implausible explanation for cross-country trip, inconsistent statements regarding their travel itinerary, nervousness, U–Haul rental agreement contained notation "CA," which led officer to believe rental paid for in cash, and inordinate number of used tissues littering floorboard led officer to believe that there was possibility that occupants were using cocaine); *United States v. Williams*, 2013 WL 1435199, at *12 (M.D.N.C. 2013) (finding reasonable suspicion when defendant was traveling in a rental car on a known drug corridor at 12:37 a.m., travel plans were inconsistent with, and would likely exceed, the due date for return of the rental car, and driver unable to provide a permanent home address in New York even though he claimed to live there and had a New York driver's license); *United States v. Day*, 2006 WL 306644 (E.D.Va.2006) (finding reasonable suspicion when defendant was traveling in a rental car, the rental car was overdue, traveling from a known source city for illegal drugs to another known source city; and provided inconsistent travel plans).

a finding of reasonable suspicion.[50] In *Finke*, the Seventh Circuit found, under the totality of the circumstances, there was reasonable suspicion that the vehicle was transporting drugs because: (1) the car was a rental; (2) it had been driven to California and back in five days; (3) the passenger compartment appeared as if the occupants had been living in it, i.e., making a straight trip without stopping; (4) extreme nervousness; (5) defendant appeared to be feigning grogginess in an attempt to avoid answering questions; and (6) the defendant had prior drug convictions.[51] Similarly, in *United States v. Contreras*, the Tenth Circuit found reasonable suspicion existed based on the defendant's nervousness, her purported travel plans to drive 2,300 miles roundtrip for a one-day visit, the use of a rental car, and presence of food wrappers from a California restaurant when the defendant claimed to be driving to Nebraska from Las Vegas.[52]

In *United States v. Brugal*, officers stopped the defendant at a drug check checkpoint off of Interstate 95 in South Carolina.[53] In lieu of a vehicle registration, the defendant produced a rental agreement indicating that the defendant rented it in Miami, that the vehicle was to be returned to Miami in a week, and that the defendant had a New York City address.[54] While reviewing the defendant's driver's license and rental agreement, the officer asked the defendant why he exited

the interstate and where he was going.[55] The defendant responded that he needed gas and was driving to Virginia Beach.[56] During this questioning, the officer noticed that the vehicle had a quarter of a tank of gas and three pieces of luggage in the rear cargo area.[57] The defendant was in full compliance with the terms of the rental agreement, however, the officer instructed the defendant to pull over to the shoulder of the road.[58] The officer's decision to instruct the defendant to pull his vehicle over was based on the following circumstances: (1) Interstate 95 is a major thoroughfare for narcotics trafficking; (2) the defendant exited Interstate 95 after passing two well-lit decoy drug checkpoint signs; (3) the defendant rented a vehicle in Miami; (4) the defendant had a New York State driver's license and the rental agreement indicated that he had a New York City address; (5) a common practice of drug couriers is to fly to Miami, acquire drugs, rent a vehicle, and drive north; (6) the defendant indicated that he was searching for gas even though his vehicle had a quarter of a tank of gas; (7) the defendant just passed an exit with several well-lit twenty-four hour gas stations but he was looking for a gas station in an area that showed no signs of activity at 3:30 a.m.; (8) the defendant was traveling at 3:30 a.m.; and (9) there was an insufficient amount of luggage.[59] Following the defendant's consent to search, the officers discovered drugs in the vehicle.[60]

---

50. *United States v. Finke*, 85 F.3d 1275 (7th Cir. 1996).

51. *Id.*

52. *United States v. Contreras*, 506 F.3d 1031 (10th Cir. 2007).

53. *United States v. Brugal*, 209 F.3d 353, 355 (4th Cir. 2000).

54. *Id.*

55. *Id.*

56. *Id.*

57. *Id.*

58. *Id.*

59. *Id.* at 359–60.

60. *Id.* at 356.

The Fourth Circuit held in *Brugal,* under the totality of the circumstances, the officer possessed reasonable suspicion to instruct the defendant to pull his vehicle over to conduct a further investigation.[61] The Court noted that "standing alone, there is nothing atypical about an individual from New York City renting a vehicle in Miami." [62] However, the use of a rental vehicle when considered in conjunction with the officer's other observations such as unusual travel itinerary, traveling northbound on a known drug courier at 3:30 a.m.; traveling in a rental vehicle from a known source city for drugs; exiting the interstate after passing two decoy drug checkpoint signs; and the defendant's implausible story that he was looking for gas, created reasonable suspicion permitting the continuation of the traffic stop.[63]

In *United States v. Digiovanni,* the Fourth Circuit distinguished *Brugal,* finding that the police did not have reasonable suspicion to prolong a traffic stop because the defendant's unusual travel itinerary was not keyed to other "compelling suspicious behavior" [64] In *Digiovanni,* the Court held that unusual travel itinerary, driving a rental car from a "source state" on I–95 a known drug courier, and nervousness in their totality, did not support a finding of reasonable suspicion because "[s]uch facts, without more, simply do not eliminate a substantial portion of innocent travelers." [65]

Likewise, in *State v. Passerini,* the Court of Appeals of Nebraska found, under the totality of the circumstances, police officers did not have reasonable suspicion to justify a prolonged detention.[66] In that case, the officer observed that the defendant was nervous, abruptly exited the interstate, was lawfully operating a rental vehicle properly registered in his name, and had a drug-related criminal history.[67] The Court noted that "[t]he fact that [the defendant] was driving a rental vehicle is perfectly consistent with law-abiding activity, and furthermore, the matching names on the driver's license and rental agreement, coupled with the consistency of [the defendant's] story as to the timeframe of the trip ... should have dispelled, rather than created, further suspicion." [68]

Here, the mere fact that Chandler had a criminal history and was operating a rental vehicle is insufficient to differentiate this defendant from the large body of innocent rental car drivers, or to lead a reasonable officer to conclude that drug activity was afoot. Chandler was driving a rental vehicle and indicated that he was on his way to Virginia to visit family. Chandler had a valid Pennsylvania driver's license, the vehicle was rented in Pennsylvania, and the vehicle was rented in Chandler's name. Such information corroborated Chandler's statement that he was traveling from Philadelphia to Virginia to visit family.

There is nothing inherently suspicious about the use of a rental vehicle to travel

---

61. *Id.* at 360.

62. *Id.*

63. *Id.*

64. *United States v. Digiovanni,* 650 F.3d 498, 512–13 (4th Cir. 2011), *as amended* (Aug. 2, 2011).

65. *Id.*

66. *State v. Passerini,* 18 Neb.App. 552, 789 N.W.2d 60 (2010).

67. *Id.* at 68–71.

68. *Id.* at 70 (noting the fact that defendant had valid driver's license and a vehicle properly rented in his name, both of which were facts that weighed against the finding of reasonable suspicion).

from Philadelphia, Pennsylvania to Virginia. "It is possible for factors, although insufficient individually, to add up to reasonable suspicion, but it is impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation."[69] Glaringly absent in this case is any evidence that the rental vehicle was being used in conjunction with other more tangible indicators of criminal activity. For instance, Trooper Radcliffe testified that it was suspicious that Chandler was taking a "prolonged" trip to Virginia, in a rental vehicle, with no luggage. However, Trooper Radcliffe never inquired about Chandler's exact destination in Virginia, the duration of his trip, or whether he had any luggage in his trunk. Moreover, Trooper Radcliffe did not note when the vehicle was rented or when or where it had to be returned.

■ In considering the "whole picture" painted by the facts in this case, the Court concludes that a person of reasonable caution would not be warranted in believing that a nervous demeanor, prior use of an alias in 1998, use of a rental vehicle, and prior criminal history reasonably indicates that Chandler had committed, was committing, or was about to commit a crime. Trooper Radcliffe lacked the reasonable suspicion necessary to support the prolonged detention and, therefore, the evidence obtained was the result of a subsequent unjustified detention and must be suppressed.

Based on the totality of the circumstances, Trooper Radcliffe simply had a hunch, not a reasonable articulable suspicion, that Chandler was engaging in some sort of illegal actively, probably drug related. The fact that his hunch proved to be correct does not and cannot, under the United States Constitution and Delaware Constitution, legitimatize the seizure and subsequent search.

This case turns on the constitutional rights provided to all citizens by the framers of the United States Constitution and of our Delaware Constitution to be free from unreasonable searches and seizures. "The judicial branch of government is obliged to enforce these rights for the protection of all citizens," even when the end result involves suppressing evidence.[70]

## VI. CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress is **GRANTED. IT IS SO ORDERED.**

---

69. *Holden,* 23 A.3d at 849 (quoting *Harris v. State,* 806 A.2d 119, 128 (Del. 2002)).

70. *Jones,* 745 A.2d at 874.