# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE )
)
v. ) I.D. # 1905015433
)
QY – MERE MADDREY, )
)
Defendant. )

Submitted: February 10, 2020
Decided: February 25, 2020

## MEMORANDUM OPINION

*Upon Defendant's Motion to Suppress:*
**DENIED.**

Zachary Rosen, Esquire, Deputy Attorney General, Department of Justice, Wilmington, Delaware. *Attorney for the State*.

Kevin P. Tray, Esquire, Law Office of Kevin P. Tray, Wilmington, Delaware, *Attorney for Defendant*.

**Adams, J.**

1

Pending before the Court is Defendant Qy-Mere Maddrey's Motion to Suppress, filed November 4, 2019. The Motion to Suppress arises out of an approximately three-minute traffic stop and subsequent arrest of Maddrey. Defendant's Motion to Suppress focuses primarily on the issue of whether questions asked of Defendant, unrelated to the justification for the initiation of the traffic stop, measurably extended the traffic stop under *Arizona v. Johnson*.[1] For the reasons stated herein, the Court finds that they do not. Even were the Court to find the stop was measurably extended, however, the inevitable discovery doctrine applies to prevent the exclusion of the evidence Maddrey seeks to suppress. Therefore, the Court denies Defendant's Motion to Suppress.

## I.    Factual and Procedural Background

The following facts are taken from the record in this case and the Motion to Suppress hearing, including testimony from Corporal ("Cpl.") Kashner and observation of the dash cam video.

The traffic stop at issue occurred on May 23, 2019 at 10:32 p.m. Cpl. Kashner of the Newport Police Department was on routine patrol in a marked car on Route 141 near Newport, Delaware, when he observed Maddrey following too closely and failing to use a turn signal when he exited Route 141 northbound in violation of 21

---

[1] *Arizona v. Johnson*, 555 U.S. 323 (2009).

*Del. C.* § 4155. Shortly after observing Maddrey failing to use his turn signal, Cpl. Kashner signaled Maddrey to pull over and initiated a traffic stop. Cpl. Kashner asked Maddrey for his license, registration and insurance. Maddrey provided his license and registration and told Cpl. Kashner that his insurance card had not yet arrived in the mail. Maddrey was also asked questions about where he was going, where he was coming from and where he lives.

Cpl. Kashner also asked Maddrey about the two cell phones on the passenger seat. Maddrey responded by asking why he was being pulled over, and Cpl. Kashner told Maddrey that he had failed to signal a lane change. Cpl. Kashner asked Maddrey again about where he was coming from and asked to whom the car was registered and Maddrey responded by stating that the car was registered to his wife.

Cpl. Kashner asked Maddrey if there were any guns in the car, to which Maddrey responded that there were not. Cpl. Kashner again asked Maddrey about the two cell phones in the car. The dash cam video shows the two having a discussion about the phones, during which Maddrey stated that one was for music and the other was for calls. Cpl. Kashner also asked Maddrey about the broken screen on one of the phones and Maddrey stated that his son had damaged the phone at the beach. The tone of voice for both Cpl. Kashner and Maddrey during this part of the interaction was non-hostile and casual.

3

Throughout the stop, Cpl. Kashner was in a crouched position against the vehicle's door so that he was at the same level as Maddrey. Cpl. Kashner testified that positioning himself at driver level was routine for all traffic stops and required him to adjust his stance based on the size of the vehicle involved. Cpl. Kashner looked through the window of Maddrey's car with a flashlight as he was conducting the stop. Cpl. Kashner acknowledged during his testimony that his hands and flashlight were partially inside the vehicle at certain points during the stop.

The time between the initiation of the stop and Cpl. Kashner returning to his own vehicle was just over three minutes. As Cpl. Kashner was leaving Maddrey's vehicle to return to his own vehicle, Cpl. Kashner allegedly saw the butt of a gun under the driver's seat with his flashlight. As can be seen in the video, upon seeing the gun, Cpl. Kashner reached for his own handgun, then proceeded to his vehicle and called immediately for backup. Cpl. Kashner arrested Maddrey when the other officers arrived at the scene. After performing a search, police found a gun under the driver's seat of the vehicle and drugs on Maddrey's person.

## II.    Parties' Contentions

Maddrey seeks the suppression of all evidence obtained following Cpl. Kashner's questions regarding Maddrey's cell phones, child and the beach. Maddrey does not challenge the validity of the initial traffic stop. The State argues that the challenged questions did not create a second detention and that, regardless

4

of the Court's findings with respect to the challenged questions, the inevitable discovery doctrine applies to prevent the exclusion of the evidence obtained as a result of this stop.

## III. Discussion

In order to be valid under the Fourth Amendment, "the stop and inquiry must be justified at its inception by reasonable suspicion of criminal activity."[2] "Generally, a defendant who moves to suppress evidence bears the burden of establishing the challenged search or seizure violated his Constitutional rights."[3] "Where, as here, the basis for the motion is a warrantless search, the State bears the burden of providing the challenged search comported with the defendant's constitutional rights."[4] Maddrey argues that, because Cpl. Kashner asked questions about the cell phones in his vehicle, his child and the beach, and these questions measurably extended the stop, Maddrey's rights against unreasonable search and seizure under the Fourth Amendment have been violated. The Court finds that these questions did not measurably extend the stop and that, regardless, the inevitable

---

[2] *Caldwell v. State*, 780 A.2d 1037, 1046 (Del. 2001).
[3] *State v. Medina*, 2020 WL 104323, at *3 (citing *State v. Dollard*, 788 A.2d 1283, 1286 (Del. Super. 2001); *State v. McElderry*, 2018 WL 4771786, at *2 (Del. Super. Oct. 1, 2018)).
[4] *Id.* at *3 (citing *Hunter v. State*, 783 A.2d 558, 560 (Del. 2001); *McElderry*, 2018 WL 4771786, at *2).

discovery doctrine prevents the exclusion of the evidence Maddrey seeks to suppress.

### 1. Cpl. Kashner's unrelated questions did not "measurably extend" the traffic stop.

In *Arizona v. Johnson*, the United States Supreme Court found that it "has made plain" that "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop […] does not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop."[5] Courts have struggled to define "measurably extend" when applying this principle to traffic stop cases.[6] The Court is required to "recognize the rule of *Arizona v. Johnson*" when analyzing this issue.[7]

Pursuant to established Delaware law, an officer's questions do not constitute a second detention when the questions are either: (1) authorized by statute; or (2) part of routine police questioning.[8] Under 11 *Del. C.* § 1902, an officer conducting a traffic stop is authorized to "demand the person's name, address, business abroad and destination. Any person so questioned who fails to give identification or explain the person's actions to the satisfaction of the officer may be detained and further

---

[5] *Arizona*, 555 U.S. at 333.
[6] *United States v. Green*, 897 F.3d 173, 180 (3d. Cir. 2018) (citations omitted); *State v. Medina*, 2020 WL 104323, at \*4 (Del. Super. Jan. 7, 2020).
[7] *State v. Abel*, 68 A.3d 1228, 1241 (Del. 2013).
[8] *Pierce v. State*, 2011 WL 1631558, at \*2 (Del. Apr. 29, 2011).

questioned and investigated."[9]  The questions at issue here are those which do not fall under § 1902 and are unrelated to Maddrey's alleged failure to signal a lane change.[10]  As such, the Court must determine whether these questions measurably extended the traffic stop.

"Although questions unrelated to the initial justification for the stop might not *per se* require reasonable suspicion or consent to further question, the Delaware Supreme Court has made clear that such inquiries must not measurably extend the duration of the stop."[11]  An officer creates a second seizure requiring additional reasonable suspicion when "a traffic stop goes beyond fulfilling its initial purpose and the stop measurably was extended."[12]

A determination of whether a stop has been measurably extended by unrelated inquiries "necessarily involves a fact-intensive inquiry in each case."[13]  The cases cited in the briefings on this Motion and during oral argument, with regard to

---

[9] 11 *Del. C.* § 1902.

[10] The State argues that officers are often required to build rapport with the people they interact with by asking about topics unrelated to the purpose of the interaction. The Court declines to make a finding as to whether any of the challenged questions asked by Cpl. Kashner constitute "routine police questioning" under *Pierce*.  Cpl. Kashner did not provide testimony on this point.

[11] *Medina*, 2020 WL 104323, at *6 (citing *Chandler*, 132 A.3d at 143; *Murray v. State*, 45 A.3d 670, 675 (corrected) (Del. July 10, 2012)).

[12] *Id.* at *4 (citing *Caldwell*, 780 A.2d at 1047; *Stanley*, 2015 WL 9010669, at *2 (Del. Super. Dec. 9, 2015)).

[13] *See Caldwell*, 780 A.2d at 1048*; Dillard*, 2018 WL 1382394, at *5 (distinguishing *Pierce*).

7

defining a measurable extension, present facts that are distinct from those underlying the present case. In *Murray* and *Winn*, the initial stops had concluded before the officers engaged in additional investigations.[14] In *Caldwell*, the driver was ordered out of the car, frisked and handcuffed.[15] In *Dillard*, the driver was ordered out of the car while an officer wrote a citation.[16] An officer also called for a K-9 unit to search the car.[17] In *Abel*, the officer conducted a pat-down of the driver.[18] In *Chandler*, the officer waited for backup for 18 minutes after returning to his car to conduct routine computer checks.[19] After backup arrived, one of the officers conducted a pat down of the driver and the officers continued to question the driver.[20] A K-9 unit was called and arrived about 40 minutes after the start of the traffic stop.[21] The State conceded in that case that the investigation "was extended beyond the traffic stop."[22] The present case requires the Court to determine whether the challenged questioning during an ongoing traffic stop, alone, constituted

---

[14] *Murray*, 45 A.3d at 674 ("This case, then, involves baseless police investigation after the conclusion of a traffic stop."); *Winn*, 2006 WL 2052678, at *1 (Del. Super. July 3, 2006).
[15] *Caldwell*, 780 A.2d at 1049.
[16] *Dillard*, 2018 WL 1382394, at *2 (Del. Super. May 17, 2018).
[17] *Id.*
[18] *Abel*, 68 A.3d at 1233.
[19] *State v. Chandler*, 132 A.3d 133, 137 (Del. Super. 2015).
[20] *Id.* at 137.
[21] *Id.* at 138–39.
[22] *Id.* at 140.

a measurable extension of the traffic stop, which lasted approximately three minutes.

Cpl. Kashner testified that he asked Maddrey about the two cell phones on the passenger seat to determine whether Maddrey was using the phones in connection with any crimes. Based on his training and experience, Cpl. Kashner found the presence of multiple cell phones to be "odd" and potentially indicative of drug dealing, terrorism or other criminal activity. Although Cpl. Kashner's questions about Maddrey's phones, children and the beach were unrelated to Maddrey's failure to signal a lane change, Cpl. Kashner did not create a second seizure in asking these questions.

The total length of the stop from Cpl. Kashner turning on his flashing lights to finding the gun and returning to his own vehicle was no more than four minutes. Cpl. Kashner testified that a normal traffic stop should take seven to twelve minutes to complete. Cpl. Kashner did not end his traffic violation investigation in order to begin a second investigation of Maddrey's possession of multiple cell phones, but rather continued his investigation of the traffic violation until he saw the gun under Maddrey's seat. The Third Circuit in *Green* points to the United States Supreme Court's failure to explain how an officer could possibly do multiple tasks at once without taking up any additional time.[23] Cpl. Kashner's actions in this case come

---

[23] *Green*, 897 F.3d at 180.

about as close as physically possible to accomplishing this. The Court finds that the stop in this case was not measurably extended by the unrelated inquiries that occurred. Therefore, the State has met its burden to prove that no second seizure occurred and Cpl. Kashner did not require reasonable suspicion to ask the unrelated questions.

**2. Even if the Court were to find that the stop was measurably extended, the inevitable discovery doctrine applies to Cpl. Kashner's discovery of the gun and prevents the exclusion of the evidence Maddrey seeks to suppress.**

Even if the Court were to find that the unrelated questions measurably extended the stop, the inevitable discovery doctrine applies to prevent the exclusion of the evidence Maddrey seeks to suppress.[24] "Delaware accepts and consistently applies the inevitable discovery exception to the exclusionary rule," which provides that "evidence, obtained in the course of illegal police conduct, will not be suppressed if the prosecution can prove that the incriminating evidence would have been discovered through legitimate means in the absence of official misconduct."[25] In the present case, the State must show that the gun was discovered in plain view

---

[24] For the purpose of analysis under the inevitable discovery doctrine, the Court assumes that "illegal police conduct" occurred, although this is contrary to the Court's findings, as discussed above.

[25] *State v. Holmes*, 2015 WL 5168374, at *9 (Del. Super. Sept. 3, 2015) (citing *State v. Lambert*, 2015 WL 3897810, at *6–7 (Del. Super. June 22, 2015); *State v. Parks*, 95 A.3d 42, 51 (Del. Super. 2014); *Cook v. State*, 374 A.2d 264, 267–68 (Del. 1977)).

10

and that the gun would have been discovered even if Cpl. Kashner had not asked the challenged questions.

### a. Cpl. Kashner discovered the gun in plain view.

In order for the inevitable discovery doctrine to apply, the State must prove that Cpl. Kashner used legitimate means to discover the gun.[26] Under the plain view doctrine, "the mere observation of an item in plain view does not constitute a Fourth Amendment search."[27] "A law enforcement officer may seize, without a warrant, contraband that the officer observes in plain view, but only if (1) the officer is lawfully in a position to observe the contraband, (2) the item's evidentiary value is immediately apparent, and (3) the officer has a lawful right of access to the item."[28] Maddrey challenges the first prong, arguing that the gun was not in plain view because Cpl. Kashner required a flashlight to see the gun and Cpl. Kashner's hand and flashlight extended into the vehicle during the course of the stop.

The fact that Cpl. Kashner used a flashlight to facilitate his search of the vehicle during this stop has no bearing on the plain view analysis.[29] It is "beyond dispute" that Cpl. Kashner's shining a flashlight to illuminate the interior of

---

[26] *Holmes*, 2015 WL 5168374, at *9.
[27] *Hardin*, 844 A.2d 982, 985 (Del. 2004) (quoting *Williamson v. State*, 707 A.2d 350, 358 (Del. 1998)).
[28] *Id.*
[29] *Hawkins*, 646 Fed.Appx. 254, 257, n. 5 (3d. Cir. Apr. 7, 2016) (citing *Texas v. Brown*, 460 U.S. 730, 739–40 (1983)).

Maddrey's car "trenched upon no right secured to the latter by the Fourth Amendment."[30]   There is no expectation of privacy "shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers."[31]   An item is in plain view "when it is discoverable by police officers in the normal course of their investigative duties."[32]   "The plain view doctrine thus is not inconsistent with concealment from ordinary observation because the latter does not incorporate an investigating police officer's range of perceptions."[33]

Maddrey argues that *Miller v. State*[34] and *Laws v. State*[35] prohibit Cpl. Kashner's extension of his hand and flashlight through the open window as a breach of a threshold.  *Miller* involves an officer's view of a dog house with a flashlight and provides no guidance on whether Cpl. Kashner's conduct would constitute such a breach.  The *Laws* court provided no mention of breaching a threshold and did not discuss any facts relevant to such an analysis.

In *McDougal v. State,*[36] an officer involved in a traffic stop "stepped into the 'V' area between the open door and the vehicle's frame" because it was difficult for

---

[30] *Texas*, 460 U.S. at 741.
[31] *Hardin*, 844 A.2d at 985, n. 4 (quoting *Texas v. Brown*, 460 U.S. 730, 740 (1983)).
[32] *Id.* (quoting *Robertson v. State*, 704 A.2d 267, 268–69 (Del. 1997)).
[33] *Id.*
[34] 310 A.2d 867 (Del. 1973).
[35] 277 A.2d 676 (Del. 1971).
[36] 2015 WL 7272051 (Del. Nov. 16, 2015).

the officer to see through the tinted windows to determine whether there were any additional passengers in the car.[37] The officer left the door as it was, remained outside the vehicle and "did not cross the threshold of the door frame."[38] The *McDougal* court found that, therefore, the officer was "lawfully in a position to observe the contraband."[39]

Cpl. Kashner testified that the position in which he was standing was routine for traffic stops and was intended to bring him to the driver's level. In order to be face-to-face with a driver during a traffic stop, an officer might be required to stand in different positions depending on the size of the vehicle. In this case, Cpl. Kashner was in a crouched position leaning against the door of the car because of its smaller size. Based on the video and Cpl. Kashner's testimony, it appears that the extensions of Cpl. Kashner's hand or flashlight a few inches through the open driver's-side window were merely natural consequences of Cpl. Kashner doing a routine scan of the car's interior while standing in this particular position.

Cpl. Kashner's testimony and the dash cam video indicate that Cpl. Kashner did extend his hand and flashlight a few inches beyond the door frame at certain times during the course of the stop. Cpl. Kashner also testified that, at the time he

---

[37] *Id.* at *1.
[38] *Id.* at *2.
[39] *Id.*

13

saw the gun under the driver's seat, his hands and flashlight were on the outside of the vehicle. This is also supported by the dash cam video.

The Court is not persuaded that Cpl. Kashner's conduct in looking through the driver's-side window in this case was unlawful. The Court finds that Cpl. Kashner was lawfully in a position to observe the gun in plain view and, thus, the plain view doctrine applies to Cpl. Kashner's discovery of the gun under the driver's seat.

### b. Cpl. Kashner would have discovered the gun even if he had not asked any questions unrelated to the initial purpose of the stop.

Maddrey argues that Cpl. Kashner used the time taken to ask Maddrey questions unrelated to the purpose of the stop to further search Maddrey's vehicle through the windows with a flashlight. Cpl. Kashner testified that, as a matter of routine police procedure, he would have scanned the entire interior of the vehicle just as he did here, regardless of the questions asked or responses to those questions. Cpl. Kashner testified that the order in which he scans different parts of the vehicle changes depending on the circumstances or the type of vehicle involved and that, here, the area near the driver's seat happened to be the last area he checked. He would not have walked away from the vehicle without looking at the area under the driver's seat and, therefore, would have seen the gun at that point regardless of whether he had taken the time to ask unrelated questions.

14

In *State v. Holmes*,[40] the court highlighted the distinction between speculation and certainty under the inevitable discovery doctrine.[41] The *Holmes* court found that the officer's testimony, including statements that the officer "probably would have watched [the defendant] a little bit longer," that the officer "might have had someone stop [the defendant]," and that the officer could not "speculate after the traffic stop," did not establish that "a plan certain was set in motion to apprehend the Defendant had the traffic stop not occurred."[42]

In the present case, Cpl. Kashner was able to provide testimony as to routine police procedure for traffic stops. Cpl. Kashner testified that, in following this routine police procedure, he would have looked at the area under the driver's seat regardless of the questions he asked. This is distinct from the speculative testimony provided in *Holmes*. That Cpl. Kashner would have found the gun even if he had not asked certain questions is not speculation as to what *could* have happened.[43] This is a matter of routine practice and the State has met its burden in proving that the gun "would" have been found regardless of any misconduct by the officer, as supported by Cpl. Kashner's testimony.[44] Therefore, the inevitable discovery

---

[40] 2015 WL 5168374 (Del. Sept. 3, 2015).
[41] *Id.* at *9–10.
[42] *Id.* at *10.
[43] *See Id.* at *9. ("There is a significant difference between what could have happened and what would have happened.")
[44] *See Cook*, 374 A2d. at 268.

15

doctrine applies to Cpl. Kashner's discovery of the gun under the driver's seat and, thus, the evidence obtained following Cpl. Kashner's discovery of the gun should not be excluded.

## IV. Conclusion

For the foregoing reasons, Defendant's Motion to Suppress is **DENIED**.

**IT IS SO ORDERED.**

Meghan A. Adams, Judge

Original to Prothonotary