IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| THOMAS GORDON, | § | |
| | § | No. 461, 2019 |
| Defendant Below, | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | ID No. 1807010648(K) |
| STATE OF DELAWARE, | § | |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: October 14, 2020
Decided: January 6, 2021

Before **SEITZ**, Chief Justice; **VALIHURA, VAUGHN**, **TRAYNOR**, and **MONTGOMERY-REEVES,** Justices, constituting the Court *en Banc*.

Upon appeal from the Superior Court of the State of Delaware. **AFFIRMED.**

Nicole M. Walker, Esquire, (*argued*) and Bernard J. O'Donnell, Office of Defense Services, Wilmington, Delaware *for Appellant Thomas Gordon*.

John R. Williams, Esquire, Department of Justice, Dover, Delaware for *Appellee State of Delaware*.

**TRAYNOR**, Justice:

We confront two important issues in this appeal. One relates to a police officer's reliance on information provided by his fellow police officers when deciding whether to stop a motor vehicle traveling on our public roadways. In addressing this issue, we adhere to the "collective knowledge" doctrine that we first recognized in *State v. Cooley*.[1]

The other issue—whether a trial court's consideration of the lawfulness of a warrantless detention and arrest is constrained by the facts alleged in a later filed arrest-warrant affidavit—forces us to re-examine our holding in *McDonald v. State*.[2] We hold today that such a "four corners" test, though appropriately applied to search-warrant applications and arguably to arrest-warrant affidavits when the arrest warrant itself is challenged, should not be applied under the facts of this case. In so holding, we affirm the defendant's convictions and overrule *McDonald*.

## I. FACTUAL BACKGROUND

### A. The Motor Vehicle Stop

As Delaware State Police ("DSP") Trooper Brian Holl was on patrol in Kent County, he received a call from DSP Detective Thomas Macauley, a member of a "drug task force"[3] in New Castle County. Before the call, Trooper Holl was aware

---

[1] 457 A.2d 352 (Del. 1983).
[2] 947 A.2d 1073 (Del. 2008).
[3] App. to Opening Br. at A196.

of Detective Macauley's and his brother Detective Michael Macauley's involvement in a wiretap investigation known as "Operation Cutthroat."[4] Detective Thomas Macauley told Trooper Holl that his brother Michael and other officers had been surveilling a blue Mazda that was, at the time of the call, southbound on Delaware State Route 1 heading towards Kent County. Detective Macauley shared with Detective Holl the reason for the surveillance of the Mazda: the surveilling officers had just "watched a drug transaction"[5] between the occupants of the car and one of Operation Cutthroat's targets. Macauley also provided Holl with additional background including the substance of an intercepted phone conversation that led to the surveillance of what appeared to be the previously-mentioned drug transaction.[6]

Because the Macauleys wished to maintain the secrecy of the ongoing wiretap investigation, they enlisted Trooper Holl's assistance in the apprehension of the blue Mazda's occupants. Detective Macauley's instructions to Trooper Holl were clear:

> To keep the integrity of the investigation of the wiretap investigation, I need a traffic stop. That means you need to . . . develop your own probable cause and go from there. Nothing about the wiretap can be revealed, obviously, for the integrity of the investigation.[7]

---

[4] *Id.* at A199.

[5] *Id*. at A230.

[6] Trooper Holl testified that, when Detective Thomas Macauley called him "[he] already knew that . . . the wiretap was going on. And when [Macauley] called [him], he said, 'this is what we know, this is what we intercepted on the phone, [and] this is what we saw." *Id.* at A234.

[7] *Id.*

To Trooper Holl, this meant that he was to justify the stop of the Mazda, if possible, by the detection of a traffic violation. He believed he found one in the form of a violation of 21 *Del. C.* § 4331, a section of the Motor Vehicle Code that, among other things, requires the display of headlights "during . . . rain or when windshield wipers are in use because of weather conditions."[8] According to Trooper Holl's Affidavit of Probable Cause drafted and sworn to later that day, the Mazda's headlights were not activated despite "inclement weather."[9] Holl's Affidavit stated further that "it was raining with wet roadways and overcast skies."[10]

Because of the perceived headlight infraction, Trooper Holl initiated a motor vehicle stop by activating his emergency lights. It was 4:30 p.m. The Mazda, according to Holl, "took an abnormally long time to stop,"[11] which heightened Holl's safety concerns as he thought it could be a sign that the vehicle's occupants might be "get[ting] ready to run."[12] But the Mazda came to a complete stop, and when Holl approached its passenger side, he saw that Jasmon Smith was the driver and Thomas Gordon, with whom Holl had prior interactions, was in the front passenger seat.

---

[8] 21 *Del. C.* § 4331.
[9] App. to Opening Br. at A14.
[10] *Id.*
[11] *Id.* at A235.
[12] *Id.*

4

Trooper Holl was immediately met with questions from Gordon, who wanted to know the reason for the stop. Gordon was unable to produce a license or other identification and, according to Holl, "was just not compliant compared to a normal traffic stop."[13] Following that, the driver—Jasmon Smith—opened the glove compartment to get his insurance card and, when he did, Holl saw a clear plastic baggie containing a green leafy substance—what Holl believed to be marijuana. Holl then removed Gordon from the car and handcuffed him. After back-up arrived, Holl searched the Mazda, finding a black plastic bag "containing a large amount of brand new packaging for the sale and distribution of heroin."[14] Holl also found a window motor, which he knew from his training and experience is a device commonly used to power aftermarket secret compartments that are installed in motor vehicles to conceal narcotics while in transport.

At the scene of the stop, Trooper Holl conducted a pat-down search for weapons of Smith without incident. But when he tried to pat-down Gordon, Gordon "became very hostile"[15] and became particularly agitated when the pat-down approached "his groin and belt like area."[16] One of the back-up officers, Corporal Long, also attempted a pat-down search of Gordon at the scene, but found it difficult

---

[13] *Id.* at A236.
[14] *Id*. at A239.
[15] *Id*. at A242.
[16] *Id*. at A244.

because Gordon was "acting strange."[17]  Eventually, Gordon was taken back to DSP Troop 3 headquarters where, during another attempted pat-down search, Detective Michael Macauley "felt a suspicious package in [Gordon's] pants, a bulge."[18] Detective Macauley asked Gordon to remove the item, but Gordon refused. Gordon's pants were then "pulled down just enough to remove the plastic bag that was on the right side by his right testicle."[19]  It was later determined that the bag contained approximately 11 grams of heroin.

## B.    The Arrest Warrant

That evening, Trooper Holl took Gordon before the nearest available Justice of the Peace Court in Kent County where Holl also filed an Adult Complaint and Warrant supported by an Affidavit of Probable Cause.  The Complaint consisted of six charges, including drug dealing in heroin, possession of marijuana, and possession of drug paraphernalia.  The Complaint did not charge Gordon with the headlight violation.  In his Affidavit, Trooper Holl made no mention of Operation Cutthroat or, for that matter, any of the information that the Macauleys had shared with him before he stopped the blue Mazda.  The sole reason for the stop mentioned in the Affidavit was the alleged headlight violation.  Holl qualified his statements in

---

[17] *Id.* at A243.
[18] *Id*. at A247.
[19] *Id*. at A134.

6

the Affidavit, however, noting that he had "not listed all of the facts pertaining to this case, only those necessary to establish probable cause."[20]

## C.  Gordon's Motion to Suppress

After Gordon was indicted, he moved the Superior Court to suppress "all evidence seized and all custodial statements made as a result of unlawful searches and seizures of his person and property"[21] on the date of his arrest.  Gordon's motion challenged the legality of what he described as "the warrantless strip search"[22] that occurred at Troop 3 on the grounds that "[n]o strip search should have been conducted without obtaining a search warrant beforehand."[23]  On appeal, Gordon has abandoned this challenge.

But Gordon also incorporated by reference his codefendant Smith's suppression motion, which disputed the factual foundation upon which Trooper Holl based his decision—or so Gordon thought when he filed his motion—to stop the Mazda in which Smith and Gordon were traveling.  Relying on a video recorded by Trooper Holl's in-car camera, Smith's motion alleged that it was not raining at or during the time immediately preceding the stop.  Smith alleged specifically that the video did not support Holl's claim that it was raining as evidenced by the paucity of

---

[20] *Id.* at A15.
[21] *Id.* at A69.
[22] *Id.* at A70.
[23] *Id.*

7

raindrops on Holl's windshield and camera lens. And no one else in the area at the

relevant time seemed to be using their wipers either as outlined in the motion:

> . . . Before initiating the stop of the Defendant's vehicle, Trooper Holl first passes a silver minivan. The silver minivan does not have its headlights or windshield wipers activated.

> . . . During the course of the stop and subsequent search, over forty vehicles pass the scene of the stop without headlamps or windshield wipers activated. Less than ten vehicles pass with headlights or parking lamps activated, but not windshield wipers. Of the vehicles the [sic] pass, over 50 during the course of the stop, none appear to have windshield wipers activated.

> . . . During the course of the stop, two Delaware State Police vehicles are captured approaching the area of the stop by Trooper Holl's in-car camera. The State Police vehicles, both SUVs, approach the area at 4:39 and 4:42 respectively. Neither State Police SUV has its headlamps or windshield wipers activated.

> . . . At approximately 4:40:25 a red convertible passes the area of the stop with its top down.[24]

## D.     The State's Response

Despite the shadow cast upon Trooper Holl's headlight rationale for the

vehicle stop by the detailed—and readily verifiable—allegations in Smith's motion,

the State, in its written response, stuck to its guns. "The sky was overcast,"

proclaimed the State, "the roads were wet[,] and it was actively raining."[25]    But

---

[24] *Id*. at A53–54.
[25] *Id*. at A75.

shortly after the Superior Court scheduled a hearing on Gordon's motion, the State reconsidered and filed an addendum to its earlier response.

Although the addendum is vague, we recognize that when it was filed, maintaining the secrecy of the Operation Cutthroat wiretap was still a legitimate concern.[26]  Be that as it may, the State disclosed that:

> . . . At the time of the traffic stop, Trooper Holl was in communication with other Delaware law enforcement officers who were conducting a wiretap investigation in New Castle County.  The wiretap officers relayed a discussion between the Target and Thomas Gordon.  These officers also told Trooper Holl of the observed meet-up and constant surveillance on the Mazda.

> . . . Based on the information received from other law enforcement officers, Trooper Holl had, at least, a reasonable, articulable suspicion that the driver was committing the traffic violation noted *as well as possessing controlled substances at the time of the stop*.[27]

### E.    The Suppression Hearing

With this revelation, the stage was set for the hearing on Gordon's (and Smith's) motion to suppress.  The hearing took place over three days, during which

---

[26] When the addendum was filed and even during Gordon's suppression hearing a year after his arrest, maintaining the secrecy of the wiretap investigation remained a concern.  Therefore, before the hearing, the Superior Court entered a protective order limiting the defense's use of discovery materials.  And when the prosecution sought to elicit testimony during the suppression hearing from Detective Thomas Macauley regarding the substance of the intercepted calls between Gordon and one of the investigation's targets, the defense, oddly enough, objected on the grounds that it would violate the protective order and was too "far afield."  App. to Opening Br. at A201–06.  The court sustained the objection and, therefore, the details of the intercepted calls are not in the record.

[27] *Id*. at A91–92 (emphasis added).

the Superior Court heard the testimony of Trooper Holl, the two Detectives Macauley, and Gordon. The court also reviewed the video from Trooper Holl's in-car camera. We have already touched upon the most salient aspects of Trooper Holl's testimony. Thus, the following factual discussion focuses on why the Macauleys called upon Trooper Holl and asked him to follow and, if feasible, detain the blue Mazda and its occupants.

1.    *Detective Thomas Macauley*

In July 2018, Detective Thomas Macauley was Operation Cutthroat's lead investigator. At that time, the operation was ten months old and would last until September 1, 2018. As of July 15, 2018—the date of Gordon's arrest—the investigation had captured many telephone conversations between the operation's target, Kiree Wise, and Gordon. On that particular date, Detective Thomas Macauley listened to a conversation between Wise and Gordon that led Macauley to believe that Gordon was going to meet with Wise at the Georgetown Apartments "to conduct a drug transaction."[28] Macauley instructed other officers, including his brother Michael, to establish surveillance at that location, the fruits of which will be discussed below. Macauley stayed in touch with the surveillance teams as the events at the Georgetown Apartments unfolded.

---

[28] *Id*. at A292.

When the surveillance confirmed Detective Thomas Macauley's suspicions about the transaction between Wise and Gordon and it became apparent that Gordon was heading south to Kent County, Macauley called Trooper Holl. Macauley reached out to Holl, hoping that he was working that day, because the two were friends and, according to Macauley, Holl had "significant experience in drug investigations, particularly motor vehicle stops relating to drug investigations and drug trafficking."[29] It was also important that, if the opportunity for a traffic stop arose, an officer other than one of the surveilling officers, all of whom were in unconventional, unmarked police vehicles without emergency equipment, initiate the stop. The secrecy of the wiretap investigation was also a consideration as, at the time, there were sealed indictments pending in New Castle County naming approximately forty individuals many of whom had not yet been apprehended.

During Detective Macauley's suppression hearing testimony, he described his instructions to Trooper Holl:

> I advised [Trooper] Holl that . . . our surveillance units had observed what we determined or believed to be a drug transaction. I told him that we were able to corroborate this information from intercepted telephone calls and that was consistent with what we saw and what we heard.
>
> I advised him of the individual, Mr. Gordon, that we positively identified as being I guess a passenger in the motor vehicle . . . . And I advised him that we had active surveillance on the vehicle as it departed the drug

---

[29] *Id.* at A294.

11

transaction, and we were continuing to monitor the vehicle by our surveillance units.

. . . .

I asked Trooper Holl if he was in a position that he could potentially assist us. All of our surveillance officers were in unconventional vehicles.[30]

### 2. *Detective Michael Macauley*

Detective Michael Macauley is a DSP Detective assigned to the Governor's Task Force.[31] In July of 2019, the task force was assisting DSP Troop 2's drug unit with Operation Cutthroat. Around 3:00 in the afternoon on the day of Gordon's arrest, Detective Michael Macauley was conducting surveillance at the Georgetown Manor Apartments on Christiana Road in Newark. Macauley had followed Kiree Wise, who was in a Honda, to that location after receiving information derived from one of the operation's wiretaps that Wise would be "meeting an unknown individual there to complete a drug transaction."[32]

Detective Macauley positioned his vehicle about 50 feet—less than the distance from the pitcher's mound to home plate—from where Wise was parked.

---

[30] *Id.* at A294–95.

[31] The Governor's Task Force has been described as part of "a statewide crime reduction initiative that targets high-risk probationers to ensure that they remain in compliance with curfews and other conditions of their probation. At [its] core . . . are police and probation/parole officer teams who enforce probation curfews, engage in surveillance activities, and conduct special investigations in targeted high crime areas." Richard J. Harris & John P. O'Connell, *Operation Safe Streets/Governor's Task Force 2005 Annual Report* 3 (2006), https://cjc.delaware.gov/wp-content/uploads/sites/61/2017/06/05_OSS_GTF_Annual_Report-min.pdf.

[32] App. to Opening Br. at A126.

Macauley had a clear view of Wise. Shortly after 3:00 p.m., the previously mentioned blue Mazda pulled up next to Wise's Honda. Wise got out of the Honda, initially walking over to the driver's side of the Mazda. He then turned and walked to the rear of the Mazda where he greeted Thomas Gordon, who had alighted from the passenger side, with a hug. After a brief conversation, Wise returned to the Honda and retrieved something, but Macauley could not tell what it was; whatever it was, Wise gave it to Gordon who put it in his pocket.

Detective Macauley then noticed a tan Ford Focus pull up "on the same street a couple cars down."[33] An individual—later identified as John Gordon—got out of the Ford Focus holding a black plastic bag. By this time, Jasmon Smith, the blue Mazda's driver, was out of the car. John Gordon walked over to Smith and handed him the black bag. Smith opened and peeked into the bag and then put it in the Mazda's back seat. Smith and John Gordon then walked over to the Ford Focus and appeared to be looking at something in its trunk. Then Smith and Thomas Gordon got back into the Mazda and departed with Smith behind the wheel and Thomas Gordon in the front passenger seat. Detective Macauley followed.

As Detective Macauley and two other surveillance units followed the Mazda from Newark to Kent County, the Mazda "kept . . . pulling over," which Macauley

---

[33] *Id*. at A128.

13

interpreted as "countersurveillance to see if anybody was following them."[34] Nevertheless, Macauley was able to maintain contact and eventually contacted Trooper Holl (presumably after his brother Thomas had spoken with Holl), telling him that he was following a vehicle, whose occupants had been observed "possibly . . . conduct[ing] a drug transaction up in New Castle County."[35] Macauley also provided Holl with a description and location of the blue Mazda, as well as its registration information. Within ten to fifteen minutes, Detective Macauley watched as Trooper Holl stopped the Mazda near Pearson's Corner.

### F. The Superior Court's Denial of Gordon's Motion

As mentioned, Gordon's motion to suppress was based on two arguments. First, incorporating Smith's motion, Gordon claimed that "[t]he weather conditions at the time of the alleged traffic offense leading to the stop [did] not support a factual finding that headlights were required under Delaware law.[36] The stop, therefore, was—according to Gordon—an illegal seizure, and the evidence obtained as a result should be excluded at trial. The State sought to justify the vehicle stop on two grounds: (i) that Trooper Holl had a reasonable suspicion to stop the vehicle for not displaying its headlights while it was raining and (ii) that "[b]ased on the information

---

[34] *Id*. at A130.
[35] *Id.* at A153.
[36] *Id*. at A56.

14

received from other law enforcement officers Trooper Holl had, at least, a reasonable, articulable suspicion that the driver . . . possess[ed] controlled substances at the time of the stop."[37]

Second, Gordon challenged the legality of the "warrantless strip search"[38] after Gordon was taken into custody. Gordon has abandoned his challenge to the strip search. Thus, our review is limited to the Superior Court's decision regarding the lawfulness of the stop of the blue Mazda.

After reviewing the video of the stop recorded by Trooper Holl's in-car camera, the Superior Court made short work of the State's claim that the driver of the blue Mazda committed a headlight violation. Pointing to the fact that only a single additional water drop appears on Trooper Holl's windshield during the entire 22-minute recording and that "of well over 50 vehicles observed in the [video], not a single one ha[d] its windshield wipers in use,"[39] the court found that the State had failed to carry its burden of proof that it was raining at the time of the traffic stop. But the court ruled that "Trooper Holl had justification for pulling over the vehicle separate and apart from the alleged traffic offense based upon the suspected drug transaction."[40] Relying on the "collective knowledge" doctrine, the court cited

---

[37] *Id*. at A91.
[38] *Id*. at A70.
[39] Ex. A to Opening Br. at 5.
[40] *Id*. at 7.

15

Detective Thomas Macauley's interception of the conversation in which Gordon was planning a drug transaction at the Georgetown Manor apartments and the ensuing confirmatory surveillance. The Macauley brothers communicated these facts, the court found, to Holl who could reasonably rely upon them as justifying the vehicle stop regardless of whether he sought to justify the stop on other grounds in the interest of maintaining the wiretap investigation's integrity. Accordingly, the Superior Court denied Gordon's motion to suppress.[41]

After a four-day trial, the jury returned guilty verdicts as to aggravated possession of heroin and conspiracy in the second degree, but acquitted Gordon of drug dealing and possession of drug paraphernalia.[42] Following a presentence investigation, the court declared Gordon a habitual offender as to the conspiracy charge, and sentenced him to an aggregate of 30 years imprisonment.

## II.    GORDON'S CONTENTIONS ON APPEAL

In this appeal, Gordon advances a single argument—that "[the] police officers did not have probable cause to stop the [blue Mazda] or arrest and search [Gordon]"[43]—on three separate grounds. First, Gordon contends that the "[o]fficers

---

[41] The Superior Court made several additional findings relating to the extension of the traffic stop and search of the Mazda after marijuana was observed in plain view when Smith opened the glove compartment and the search of Gordon's person at DSP Troop 3. But because Gordon does not challenge those findings on appeal, we need not address them here.

[42] The State had entered a *nolle prosequi* before the trial began on the possession-of-marijuana charge.

[43] Opening Br. at i; 7.

16

did not have probable cause and recognized as much because Trooper [H]oll was tasked with finding probable cause for a traffic violation stop."[44]  Next, Gordon argues that, because Trooper Holl was not directed to stop and seize the blue Mazda because of the suspected drug transaction, the Superior Court should not have considered what the Macauleys told Holl when determining whether Holl was justified in stopping the blue Mazda.  Finally, Gordon relies on the "four corners" doctrine, claiming that the Superior Court erred by considering Holl's communications with the Macauleys because they were not included in the arrest-warrant affidavit Holl drafted and filed after his warrantless arrest of Gordon.

## III.   STANDARD OF REVIEW

We review the Superior Court's denial of a motion to suppress for an abuse of discretion.[45]  We evaluate the court's legal conclusions *de novo* for errors in formulating legal precepts.[46]  This Court will defer to the Superior Court's factual findings after an evidentiary hearing on a motion to suppress unless those findings are clearly erroneous.[47]  Where, as here, we are reviewing the denial of a motion to suppress evidence based on an alleged illegal stop and seizure, we conduct a *de novo* review to determine whether the totality of the circumstances, in light of the trial

---

[44] *Id*. at 2.
[45] *Stafford v. State*, 59 A.3d 1223, 1227 (Del. 2012).
[46] *Lopez-Vasquez v. State*, 956 A.2d 1280, 1285 (Del. 2008).
[47] *State v. Rollins*, 922 A.2d 379, 382 (Del. 2007).

17

judge's factual findings, support a reasonable and articulable suspicion for the stop."[48]

## IV.  ANALYSIS

### A.  The Superior Court did not err in its determination that Trooper Holl's stop of the blue Mazda was justified by reasonable suspicion

The first prong of Gordon's attack on the validity of Holl's stop of the blue Mazda criticizes the Superior Court for applying the "reasonable suspicion" standard—rather than a "probable cause" standard—to the vehicle stop.  Gordon then hypothesizes that probable cause for the stop was lacking as evidenced by Detective Michael Macauley's instruction to Trooper Holl to "develop [his] own probable cause."[49]  This instruction, according to Gordon, showed that the police did not believe that what they heard during the intercepted conversation and what they saw at the Georgetown Manor apartments provided probable cause for the stop.

Gordon's contention that the State could only justify the stop of the Mazda by showing probable cause—a more demanding standard than reasonable suspicion[50]—appears to be based on the Superior Court's reliance on two automobile-stop

---

[48] *Lopez-Vasquez*, 956 A.2d at 1285.
[49] App. to Opening Br. at A234.
[50] *United States v. Sokolow*, 490 U.S. 1, 7 (1989) ("[T]he level of suspicion required for a *Terry* stop is obviously less demanding than that for probable cause . . . .").  And we have recognized that a motor vehicle stop "must be justified at its inception by reasonable suspicion of criminal activity as defined in *Terry v. Ohio*." *Caldwell v. State*, 780 A.2d 1037, 1046 (Del. 2001) (citations omitted).

18

decisions of ours, *Howard v. State*[51] and *Brown v. State*,[52] which Gordon believes establish probable cause as the standard by which motor vehicle stops are to be judged. This contention cannot withstand even cursory scrutiny.

In *Howard*, this Court could not have been clearer that "[t]raffic stops must be supported by reasonable suspicion of criminal activity."[53] We went on to find that, "[b]ased on the totality of the circumstances, [the police officer] had a reasonable basis to believe Howard had engaged in illegal drug activity before [he] stopped Howard for the traffic violations;"[54] thus, the stop was justified.

Gordon asks us to ignore these clear statements and to focus on our statement—wedged in between the two passages quoted above—that we were not required to consider Howard's constitutional claim "because the police [also] . . . had probable cause to believe Howard had engaged in illegal drug activity before they stopped the automobile."[55] Of course, if the police had probable cause, they necessarily met the less demanding "reasonable suspicion" standard. But more to the point, Gordon never explains how the observation that the police's suspicion in *Howard* rose to the level of probable cause was meant to announce the abrogation

---

[51] 931 A.2d 437, 2007 WL 2310001 (Del. Aug. 14, 2007) (TABLE).
[52] 117 A.3d 568 (Del. 2015).
[53] *Howard*, 2007 WL 2310001, at *2.
[54] *Id.*
[55] *Id.*

19

of the "reasonable suspicion" standard re-affirmed in the previous paragraph. Put simply, Gordon's reliance on *Howard* is far wide of the mark.

Gordon's argument fares no better under *Brown*, a case involving facts similar to the case now before us. In *Brown*, the officers, who were conducting a wiretap investigation, intercepted four calls in which the target and an unknown man arranged a meeting at the target's home so that the man could buy cocaine from the target. Through video surveillance at the target's house, the police saw an unknown woman and man, later identified as Brown, arrive at the target's house. The two then went around the side of the house, out of view of the surveillance camera, with the target. Five minutes later, Brown and the woman left in Brown's vehicle. An officer followed Brown for a few miles, then stopped Brown's vehicle on the pretext that there was a problem with Brown's vehicle registration. When Brown spoke up, the officer recognized his voice from the intercepted telephone calls. When Brown stepped out of his vehicle, the officer arrested him and conducted a pat-down search, finding cocaine, crack and powder, in a pouch in Brown's front pocket.

On appeal, Brown claimed that the Superior Court had abused its discretion by admitting the evidence seized from him after his arrest. He argued that he was arrested without probable cause at the scene of the motor vehicle stop and that the evidence taken from him was fruit of the illegal arrest and therefore inadmissible.

20

We rejected Brown's argument, finding that the Superior Court was within its discretion to find that the arresting officer had probable cause:

> Based on the events leading up to Brown's arrest, an objectively reasonable officer who had listened to [the target] and the unknown man arrange a drug deal could have believed that Brown was the unknown man, that he purchased drugs as planned during the telephone calls, and that he still possessed those drugs at the time he was stopped . . . . [G]iven the content of the discussion captured on the wiretap, it was reasonable for the police to infer that Brown and [the target]—who the police knew to be a cocaine dealer—had engaged in a drug deal when they were out of the camera's view, and that Brown was still in possession of those drugs minutes later, when [the officer] stopped his vehicle. Because the police had probable cause to arrest Brown, there was no reason to exclude the fruit of the search of his body incident to that arrest, *i.e.*, the drugs that [the officer] found.[56]

As with *Howard*, Gordon argues that *Brown* stands for the proposition that, in his case, the Superior Court should have applied the "probable cause" standard to Trooper Holl's stop of the blue Mazda, not "the diminished standard of reasonable suspicion;"[57] *Brown*, in our view, does nothing of the sort.

For starters, Brown's arrest occurred almost simultaneously with the stop before the arresting officer had found any contraband on Brown's person or in his vehicle. By contrast, Gordon was only arrested after Trooper Holl had observed marijuana in plain view when Smith opened the Mazda's glove compartment and

---

[56] *Brown*, 117 A.3d at 578.
[57] Opening Br. at 12.

heroin-packaging materials in the vehicle's back seat. Moreover, Gordon's motion to suppress did not challenge the lawfulness of his arrest *after* the discovery of this contraband; it was limited to an attack on the stop of the vehicle *before* the contraband was found and a claim, since abandoned, that the strip search at Troop 3 was unlawful.

If *Brown* has any relevance here, it is its support for the Superior Court's finding that Trooper Holl's stop of the Mazda was supported by reasonable suspicion. For if on very similar facts in *Brown*, we did not disturb the Superior Court's findings the officer had probable cause to arrest, it would be illogical for us to conclude here that Trooper Holl had not developed the lesser quantum of suspicion known as "reasonable suspicion."

Last but not least on this point, we note that Gordon's position that the "correct legal standard of probable cause"[58] is applicable to "vehicle seizure[s]"[59] is directly contrary to the position Gordon took in the Superior Court. In particular Gordon's codefendant's motion, which Gordon incorporated by reference in his motion, repeatedly acknowledges that the vehicle stop in question was justified if supported by reasonable suspicion. We quote here from the codefendant Smith's motion:

> First, the stop must be justified at its inception by reasonable suspicion of criminal activity as defined in *Terry v. Ohio* . . . .

---

[58] *Id.* at 11.
[59] *Id.* at 10.

22

. . . Delaware courts consistently define reasonable suspicion as an "officer's ability to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." *Chandler*, 2015 WL 1731508, at *4 (quoting *Holden v. State*, 23 A.3d 843, 847 (Del. 2011)) . . . .

. . . Reasonable suspicion entails some minimal level of objective justification for making at stop . . . .

. . . .

. . . A traffic stop is considered a seizure for the purposes of the Fourth Amendment and must be supported by a reasonable suspicion or probable cause. *United States v. Arvizu*, 534 U.S. 266 (2002).[60]

Likewise, in his opening brief's statement of the standard of review in this Court, Gordon acknowledged that when we review the denial of a motion to suppress evidence collected in the wake of an allegedly illegal stop and seizure, "we conduct a *de novo* review to determine whether the totality of the circumstances, in light of the trial judge's factual findings, support[s] a reasonable and articulable suspicion for the stop."[61] Gordon cannot square these statements in the court below and in this Court with his contention elsewhere that probable cause is the correct legal standard by which our courts determine whether a motor vehicle stop is justified. Nor has he pointed to any case law supporting this contention; we therefore reject it.

---

[60] App. to Opening Br. at A54–55.
[61] Opening Br. at 7 (quoting *Lopez-Vasquez*, 956 A.2d at 1285).

**B. The Superior Court's ruling that the collective knowledge of the police officers justified the seizure of the blue Mazda was not erroneous**

Relying on *State v. Cooley*,[62] Gordon argues next that, because Trooper Holl had not independently developed sufficient justification to stop the blue Mazda and was not "directed by another officer who possessed such information to arrest for probable cause, Trooper Holl acted without probable cause for the seizure and the arrest."[63]

Once again, Gordon conflates reasonable suspicion to effect a motor vehicle stop and probable cause to arrest. The record is clear that almost immediately after Trooper Holl encountered Smith and Gordon during the roadside stop, Holl observed marijuana in plain view when Smith opened the Mazda's glove compartment to retrieve the vehicles insurance documents. And the record is equally clear that the consequent search of the vehicle, which Gordon has not challenged on any basis other than the alleged illegality of the stop, uncovered drug paraphernalia in the form of unused heroin packaging materials. Hence, if the stop was legal, certainly Gordon's arrest after the discovery of the contraband was justified. So once again we direct our attention to the validity of the stop, this time through the lens of the "collective knowledge" doctrine.

---

[62] 457 A.2d 352.
[63] Opening Br. at 12.

24

Gordon's argument betrays a basic misunderstanding of *Cooley*, which addressed the extent to which an arresting police officer may rely on information obtained from other officers in forming probable cause for an arrest. Relevant to this appeal, this Court held in *Cooley* that arresting officers are "entitled to rely on information relayed to [them] through official channels"[64] when making an arrest.

This principle is sometimes called the "collective knowledge" doctrine.[65] Under the doctrine, "[t]he arresting officer himself need not be apprised of the underlying circumstances which give rise to a conclusion of probable cause . . . . [Instead, he can] act in the belief that his fellow officer's judgment is correct."[66] This is not to say, however, that arresting officers may arrest first, then gather previously uncommunicated information scattered among his fellow officers to support the arrest. As we noted in *Cooley*:

> To say in the abstract that probable cause is to be evaluated on the basis of the collective information of the police ignores the underlying assumption—and factual reality— that there is some communication between those officers, who do know facts amounting to probable cause, and those who do not.[67]

---

[64] *Cooley*, 457 A.2d at 355.
[65] *See, e.g.*, *State v. Holmes*, 2015 WL 5168374, at *5 (Del. Super. Ct. Sept. 3, 2015). Elsewhere, this doctrine is termed the "fellow officer" rule. *See* 2 Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment*, §3.5(b) (6th ed. 2020).
[66] *Holmes*, 2015 WL 5168374, at *4 (citations omitted).
[67] *Id.*

In this case, the Superior Court, having found that both Detectives Macauley "communicated with Trooper Holl about what they had learned and observed"[68] by way of the wiretap and related surveillance and asked for Holl's assistance, correctly applied this doctrine. Not only did the Macauleys communicate investigative facts to Holl sufficient to raise a reasonable suspicion that the blue Mazda contained contraband, thus justifying its stop—a fact Gordon conceded at oral argument[69]—but the three officers certainly possessed the requisite information collectively. And Trooper Holl understood Detective Thomas Macauley's request for assistance to mean that he should detain the vehicle, preferably in a way that would not blow the investigation's cover. So it matters little whether we base our "reasonable suspicion" analysis on the facts known by Trooper Holl or those known collectively by Holl and the two Macauleys; either way, the motor vehicle stop was supported by reasonable suspicion.

---

[68] Ex. A to Opening Br. at 5.

[69] *See* Oral Argument Video at 42:07-43:09, https://livestream.com/accounts/5969852/events/9319197/videos/212105538/player:

> Justice Traynor: Michael Macauley testified . . . that, based on what he heard through the wiretap . . . [and] what he saw in the Georgetown Manor parking lot, he believed he had just observed a drug transaction. I have a two-part question. The first part is: Based on that information, did Detective Macauley have sufficient suspicion to effect the stop of the blue Mazda? And, if he did, the second part of the question is, if he related that to Trooper Holl . . . did Trooper Holl have sufficient information upon which to base the motor vehicle stop?

> Ms. Walker: Yes, without conceding the four corners argument . . . Trooper Holl would have had reasonable suspicion for the stop . . . .

**C. It was not improper for the Superior Court to consider facts not contained in Holl's arrest-warrant affidavit, which was drafted, filed, and sworn to after Holl's warrantless arrest of Gordon**

Although not argued in the Superior Court, Gordon's final contention is that, because the arrest-warrant affidavit Trooper Holl signed and filed after Gordon's warrantless arrest did not allege that Holl relied on the information provided by the Macauleys, the Superior Court was precluded under the "four corners" test from considering the Holl-Macauley communications in determining whether Holl's stop of the blue Mazda was justified.

Under Rule 8 of this Court, ordinarily we will not consider questions that were not fairly presented to the trial court.[70] We may do so, however, when the interests of justice will be served; we find that those interests require it here. Specifically, we conclude that, had the Superior Court applied our holding in *McDonald v. State*[71]—the sole precedent upon which Gordon now relies—Gordon would have prevailed below. At the same time and for the reasons that follow, however, we believe that *McDonald* was wrongly decided, and we therefore overrule it.

In *McDonald*, the defendant appealed the Superior Court's denial of his motion to suppress evidence seized following a motor vehicle stop that McDonald claimed was not legally justified. McDonald was a passenger in a car, lawfully

---

[70] *See* Supr. Ct. R. 8.
[71] 947 A.2d 1073.

parked in a convenient-store parking lot, that was observed by a DSP officer shortly after midnight. The officer ran a registration check on the car and, because he incorrectly entered the registration number, the check showed—incorrectly—that the car was not registered. When the car eventually exited the lot, the driver did not use a turn signal to indicate that he was turning right onto the public roadway. The officer, believing that he had just witnessed a turn-signal violation, activated his emergency equipment and stopped the car. A search of the car at the scene uncovered small amounts of marijuana and cocaine, and a strip-search of McDonald at State Police headquarters yielded 15 grams of crack cocaine and a little over five grams of marijuana. Later that day, the officer applied for a warrant for McDonald's arrest. The application was supported by an affidavit of probable cause, listing the turn-signal violation as the sole basis for the vehicle stop.

McDonald moved to suppress the evidence taken from him, arguing that the purported turn-signal violation could not have provided the requisite suspicion for the vehicle stop because the Delaware Motor Vehicle Code does not require a driver to signal when entering a public highway from private property. And, according to McDonald, if there was no traffic violation, the stop was not justified.

The Superior Court found that the driver's failure to signal provided "only a very questionable suspicion."[72] But the court engaged in a "totality of the

---

[72] *Id*. at 1077.

circumstances" analysis and concluded that congregating in an area known for criminal activity, when viewed together with the innocent—if mistaken—belief that the car was unregistered and the car's "unprovoked flight"[73] from the parking lot, provided a reasonable articulable suspicion sufficient to justify the stop. In a 3-2 decision, we reversed.

The majority focused on the affidavit of probable cause attached to the application for a warrant to arrest McDonald on the drug charges, invoking the "four corners" test:

> The "four corners" test is used to determine whether an affidavit demonstrates probable cause to issue either an arrest warrant or a search warrant. Under that test, sufficient facts must appear on the face of the affidavit such that a reviewing court can ascertain from that document alone the factual basis for a determination that probable cause exists.[74]

Applying this test, the majority found that the Superior Court's reliance on facts extraneous to the affidavit ran counter to the purpose of the "four corners" test, which is to ensure that the reviewing court determines "whether the constitutional requirements of probable cause have been met without reliance upon faded and often confused memories."[75] Thus, the majority determined that the Superior Court had

---

[73] *Id*. at 1078 (quoting *Pierson v. State*, 338 A.2d 571, 574 (Del. 1975)).
[74] *Id*.
[75] *Id*. (internal quotations, brackets, and footnotes omitted).

erred as a matter of law in denying McDonald's motion to suppress and reversed his

convictions.

The dissent saw it differently, suggesting that the majority's reliance on the

"four corners" test was misplaced for two closely related reasons:

> First, the "four corners" test is appropriate for evaluating whether probable cause existed for the issuance of a warrant, a warrant issued in reliance upon an affidavit. The test is, by definition, focused on the purpose of the warrant—in this instance McDonald's arrest.
>
> . . . .
>
> Second, . . . the state trooper was under no duty to set forth all of his reasons for the warrantless stop; the facts that supported McDonald's eventual arrest were, of course, tied to the vehicle stop, but the state trooper had no reason to give a complete explanation or justification for the vehicle stop in the affidavit used to obtain a warrant for McDonald's later arrest.[76]

After a careful review of the majority's reasoning and the precedents upon

which it relied and the relevant court rules governing arrest warrants and affidavits

filed in the wake of warrantless arrests, we have concluded that the dissent was

correct and that *McDonald* should be overruled.

In *Pierson v. State*,[77] we recognized that the Delaware statutes governing

search warrants "like Federal Criminal Rule 41(c), contemplate a 'four corners' test

---

[76] *Id.* at 1084–85.
[77] 338 A.2d 571.

for probable cause."[78]  Specifically, 11 *Del. C.* § 2306 requires that a search-warrant application "be in writing, signed by the complainant and verified by oath or affirmation."[79]  That section also mandates, among other things, that "the house, place, conveyance or person to be searched"[80] be described in the application with particularity, and that "the cause for which the search is made"[81] be substantially alleged.  And 11 *Del. C.* § 2307 authorizes a judge to issue a search warrant, but only "[i]f the judge . . . finds that the facts *recited in the complaint* constitute probable cause for the search."[82]

Based upon "the clear import"[83] of these statutes, in *Pierson* this Court rejected the State's argument that a facially deficient warrant application could be saved by referring to what the issuing magistrate must certainly have known through his "official knowledge."[84]  In short, we held that "a magistrate's personal information cannot be used to save a defective affidavit."[85]

This principle, often referred to as the "four corners" rule, is faithful to the statutory requirements that search-warrant applications be made in writing and under oath and be granted only if the facts recited in the application support a probable-

---

[78] *Id.* at 573.
[79] 11 *Del. C.* § 2306.
[80] *Id.*
[81] *Id.*
[82] *Id.* § 2307 (emphasis added).
[83] *Pierson*, 338 A.2d at 573.
[84] *Id.*
[85] *Id.* at 574.

cause finding. And it has the added benefit—cited in *McDonald*—of ensuring that "'the reviewing court may determine whether the constitutional requirements have been met without reliance upon faded and often confused memories.'"[86]

We are now confronted with the question of whether the "four corners" doctrine was correctly extended in *McDonald* to arrest-warrant affidavits that are drafted and filed following a warrantless arrest; we believe it was not.

Delaware law authorizes police officers to arrest without an arrest warrant under a variety of circumstances.[87] But "[i]f not otherwise released, every person arrested shall be brought before a magistrate without delay."[88] This statutory requirement is mirrored and supplemented by Justice of the Peace Court Criminal Rule 5(a):

> An officer making an arrest under a warrant issued upon a complaint or any person making an arrest without a warrant shall take the arrested person without [un]reasonable delay before the nearest available Justice of the Peace Court of the county in which the offense is alleged to have been committed or such other Justice of the Peace Court as provided by the warrant or by statute, court rule or administrative order. If a person arrested without a warrant is brought before a Justice of the Peace, a complaint shall be filed forthwith, which shall comply with the requirements of Rule 4(a) with respect to the showing of probable cause.[89]

---

[86] *Id.* (quoting *United States v. Acosta*, 501 F.2d 1330, 1334 (5th Cir. 1974)).
[87] 11 *Del. C.* § 1904.
[88] *Id.* § 1909.
[89] J.P. Ct. Crim. R. 5(a).

Under Rule 4(a):

> If it appears from the complaint, or from an affidavit or affidavits filed with the complaint, that there is *probable cause to believe that an offense has been committed and that the defendant has committed it*, a warrant for the arrest of the defendant shall issue to any officer authorized by law to execute it.[90]

Thus, the probable-cause inquiry that precedes the issuance of an arrest-warrant is different than the inquiry into whether an officer has developed the level of suspicion required to justify an antecedent warrantless seizure—or, in this case, roadside detention—of a defendant. In the arrest-warrant context, the arresting officer must show in the complaint and affidavit that there is probable cause to believe that the defendant has committed the offenses—here, drug offenses—with which he has been charged; no such showing is required to justify an investigative detention. Moreover, there is nothing in our statutes or rules of court authorizing magistrates, during an accused's initial appearance, to pass upon the validity of an investigative detention, including a traffic stop that leads to the discovery of evidence giving rise to other charges. And, for these reasons, the officer is not required to justify the stop in his arrest-warrant application. That being the case, the

---

[90] J.P. Ct. Crim. R. 4(a) (emphasis added).

"four corners" test should not be applied under the facts presented here nor should it have been, in our view, in *McDonald*.[91]

One might reasonably ask at this point how the *McDonald* majority came to extend the "four corners" doctrine to arrest warrants that follow warrantless arrests. The answer lies in the majority's citation of *United States v. Castillo*,[92] a Ninth Circuit case in which the "four corners" test was applied to an arrest warrant. But *Castillo* involved a challenge to the arrest warrant itself and the protective sweep of the apartment that was conducted during the execution of that warrant. The defendants' motion to suppress in *Castillo* was "based on the alleged inadequacy of the arrest warrant and the lack of veracity in the supporting affidavit."[93] If the warrant was invalid, the sweep of the apartment, which came *after* the issuance of the warrant, would be subject to challenge unless saved by the good-faith exception announced in *United States v. Leon*.[94]

Here, as in *McDonald* and unlike in *Castillo*, Gordon has not challenged the validity of the arrest warrant, and there was no relationship between the issuance of the arrest warrant itself and the seizure of the evidence he asked the Superior Court

---

[91] We note that one eminent Fourth Amendment scholar has questioned the soundness of *McDonald*'s application of the "four corners" rule to the arrest warrant in that case. *See* 3 LaFave, *supra* note 65, § 5.1(h) n.377.
[92] 866 F.2d 1071 (9th Cir. 1988).
[93] *Id.* at 1075.
[94] 468 U.S. 897 (1984).

to suppress. We therefore reject Gordon's claim that the Superior Court erred by considering facts not included in the arrest warrant.

## V. CONCLUSION

The Superior Court applied the correct legal standard when it determined that, based upon the collective knowledge of the officers involved, Trooper Holl had a reasonable suspicion that the car in which Gordon was traveling contained contraband and was therefore subject to detention. In making this determination, the court did not err by considering facts extraneous to the subsequently filed arrest-warrant affidavit. We therefore affirm Gordon's convictions.