**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| STATE OF DELAWARE, | ) | |
| | ) | |
| | ) | ID 2308005232 |
| v. | ) | |
| | ) | |
| JAMAL JOHNSON, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Date Submitted: June 5, 2024
Date Decided: June 20, 2024

*Upon Defendant's Motion to Suppress –* **DENIED**.

## I.   *Introduction*

After stopping Jamal Johnson ("Johnson") for an alleged traffic violation, improper tinted windows, and a "stop code," Sargent Kashner ("Sgt. Kashner") of the Newport Police Department detained Johnson to further investigate whether Johnson (who was under 21 years old) was in possession of marijuana or had been consuming it in the vehicle.  Sgt. Kashner smelled marijuana when he approached the driver's door of the stopped vehicle.  While Johnson was further detained, Sgt. Kashner asked Johnson if he "smokes weed," to which Johnson responded: there's "probably a roach" in the car.  Sgt. Kashner then searched the vehicle and seized several items, including a gun.  Upon finding the gun, Sgt. Kashner placed Johnson under arrest.

Johnson was indicted on eight counts: (1) Carrying a Concealed Deadly Weapon; (2) Possession of a Deadly Weapon by a Person Prohibited; (3) Possession of Drug Paraphernalia; (4) Possession of Alcohol by a Minor; (5) Operating a Vehicle with Noncompliant Window Tinting; (6) No Proof of Insurance; (7) Improper Passing; and (8) Failure to Wear a Seatbelt.

Johnson filed a Motion to Suppress (the "Motion")[1] seeking to exclude the items seized from his vehicle. Because the vehicle search was warrantless, the State bears the burden to prove that the search was lawful. The State argues that Sgt. Kashner had probable cause to conduct the traffic stop for the alleged violations and the stop code. It argues that the detention was not extended and even if it were, probable cause existed to search the vehicle. The State argues in the alternative that because Johnson did not provide proof of insurance, his car would have been towed and the contents seized by the search would have been found in an inventory search, and thus, the inevitable discovery exception applies.

In his Motion, Johnson does not attack any particular part of the encounter but asserts that the State will not be able to satisfy its burden of proof. At the suppression hearing, Johnson attacked the stop on the grounds of the alleged violations, but not the stop code. Johnson attacked the further detention and search, arguing there was no probable cause.

---

[1] D.I. 9.

For the reasons discussed below, Sgt. Kashner had probable cause to execute the traffic stop. When that stop extended into a search related to possible contraband, it constituted a second seizure. Because probable cause existed to conduct a search of the vehicle, the search was valid and therefore, the Motion is DENIED.

## II.    *Factual Background*

### A.    *The body-worn camera evidence*

With the Motion, Johnson submitted a copy of Sgt. Kashner's body-worn camera ("BWC") video of Johnson's stop. The Court reviewed the entire video prior to the suppression hearing. The below factual findings are based on the BWC video.

On August 10, 2023, Sgt. Kashner executed a traffic stop of a Honda Accord. After the car came to a stop, Sgt. Kashner's BWC was activated. Sgt. Kashner instructed Johnson to turn off the car, roll down the windows, and place his hands outside of the car. Johnson was alone in the vehicle. Sgt. Kashner then approached the driver's window and asked Johnson for his license, registration, and proof of insurance. Johnson told the officer he was 18 and provided a vertical license (which indicates that he is a person under 21 years old). Johnson produced a valid registration and an insurance card, which reflected an expiration date of June 25, 2023. The officer asked if Johnson had another card, and after continuing to look, Johnson responded "naw. I don't."

3

Sgt. Kashner instructed Johnson to exit the vehicle and asked if Johnson had any weapons on him, to which Johnson said "no." Johnson consented to a pat-down. The officer asked if Johnson had any weed on him, to which he said "no." Sgt. Kashner said: "you smell like a little bit of weed."

Sgt. Kashner directed Johnson to stand towards the back of his car, where the officer asked additional questions. After collecting information on Johnson's girlfriend (who was identified as a person who also drives the car), Sgt. Kashner then instructed Johnson to sit in the back seat of the police cruiser. Johnson asked why he could not sit in his vehicle, to which Sgt. Kashner replied that he was going to have more questions for Johnson as the background check was being conducted. Sgt. Kashner also said that it was raining and "cops don't like to get wet." Johnson got into the cruiser and the officer closed the door. Johnson was not handcuffed.

Sgt. Kashner then reached into the front seat of the cruiser and grabbed blue gloves. With Johnson in the back seat, Sgt. Kashner opened the back door and asked Johnson: "Do you smoke weed?" Johnson told the officer that there was probably a roach in the car but that he had not been smoking weed. Sgt. Kashner said: "Well, you're not 21. In Delaware, you got to be 21. Is there anything in the car I need to know about?" Sgt. Kashner advised Johnson that he (Sgt. Kashner) was going to search the car. Johnson said he did not consent to a search of his car, to which the officer replied: "I don't need consent. I have probable cause."

Sgt. Kashner proceeded to search the car. He opened the driver's side door and looked in the center console, where he located two small scales and put them on the driver's seat. Sgt. Kashner continued the search and found a small green pouch on the passenger's seat and opened it. Seeing a firearm, the officer went back to the police cruiser and placed Johnson under arrest, reading him his *Miranda* rights.

Sgt. Kashner continued the search and seized a half-full bottle of wine, a grinder, and two cell phones, in addition to the gun and the scales.

### B.    *The suppression hearing*

Sgt. Kashner was the only witness at the suppression hearing. In addition to his testimony, the BWC video[2] up to the point of the arrest was played during the hearing, with Sgt. Kashner providing additional commentary. The following facts are derived from his testimony.

Sgt. Kashner observed a red 2004 Honda Accord with "heavily dark tinted windows." He also observed the vehicle pass a truck on the left side on a two-lane road, crossing over the center of the road to do so.

Sgt. Kashner ran a registration check and learned that the car did not have a "tint-waiver." The Motor Vehicle and License System, Inquire Registration results (the "Inquiry Results") showed "Tint N."[3] Sgt. Kashner explained that if the vehicle

---

[2] State Exhibit 2.
[3] State Exhibit 1.

5

had a valid tint waiver, the "Tint" would have been followed by a "Y." Because there was no waiver, Sgt. Kashner believed that the car was in violation of 21 *Del. C.* § 4313.

The Inquiry Results also reflected a Delaware State Police "stop code" for this vehicle.[4] Sgt. Kashner testified that a "stop code" is a request to have the identified vehicle stopped and to report to the investigating officer information regarding the occupants of the vehicle. Here, the stop code was in relation to a shoplifting incident. While Sgt. Kashner did not know the details of the stop code at the time he stopped Johnson, the officer testified that he later learned that two white females were wanted in connection with a shoplifting incident.[5]

Sgt. Kashner observed a 2004 Honda Accord traveling westbound on West Highland Avenue, which has one lane of travel in each direction. He further observed the Honda cross into the eastbound lane to pass a truck, which was turning right into a driveway. This maneuver was in violation of 21 *Del. C.* § 4114, according to Sgt. Kashner.

When Sgt. Kashner stopped the Honda, from the position of the front door of the police cruiser, Sgt. Kashner ordered the driver to roll down the windows and put

---

[4] *Id.*

[5] Sgt. Kashner testified on cross-exam that he did not investigate the facts of the stop code. Thus, at the time of the traffic stop, he did not know that the stop code referenced two white females. Sgt. Kashner did not take any steps to notify Delaware State Police of the stop until sometime after Johnson was arrested.

his hands outside of the car. He did this because the tint was so dark, he could not see inside the vehicle or determine how many occupants were in the vehicle.

Sgt. Kashner testified that he immediately smelled marijuana when he approached the driver's door of the car. He had Johnson exit the car out of a safety concern.

Sgt. Kashner said he told Johnson that he (Sgt. Kashner) was going to ask Johnson additional questions and that is why he wanted Johnson to sit in the police cruiser instead of Johnson's car. Sgt. Kashner testified that he wanted to put Johnson in the cruiser because he knew he was going to search the car. Although Johnson had been cooperative to that point, he was now under detention and Sgt. Kashner did not know if Johnson would become agitated and create a safety concern. Johnson was placed in the back of the cruiser and the door was closed. Thus, Johnson could not exit the vehicle unless the officer let him out.

After placing Johnson in the police cruiser, Sgt. Kashner reached into the front seat of the cruiser and grabbed blue gloves. He testified he did so to prepare for a search of the vehicle.[6] He knew he was going to search the vehicle even before he asked Johnson further questions because Johnson was under 21 and it was illegal for him to possess marijuana.

---

[6] "I don't want my DNA to transfer to any potential evidence."

7

Sgt. Kashner opened the back door of the cruiser and asked Johnson if he smokes marijuana. Johnson responded that there was probably a roach in the car. Sgt. Kashner testified that a roach is the end of a marijuana cigarette. Sgt. Kashner believed he had probable cause to search the car because in Delaware, the legal age to possess up to an ounce of marijuana is 21 and Johnson was only 18 years old. Further, smoking marijuana in a moving vehicle is prohibited.

Sgt. Kashner testified that Johnson's statement that there was probably a roach in the car lead him to believe that Johnson had been smoking in the vehicle. He testified that like smoking a cigarette, it is very unlikely that someone would smoke outside of the vehicle and then bring the butt (or roach) back into the car.[7]

Sgt. Kashner proceeded to search the car. He found the scales first. While continuing to search, he ended an incoming call on the phone, which was on the driver's seat, and put the phone in airplane mode, to avoid any possibility of evidence being destroyed. Sgt. Kashner testified that he found marijuana "shake" which are small shavings of marijuana. Sgt. Kashner did not collect any of the shake because the particles were very small. He did not find a roach.[8]

---

[7] Sgt. Kashner admitted on cross-exam that possession of a half-full bottle of wine did not mean that Johnson had consumed alcohol while operating the vehicle and that it was possible that marijuana was not smoked while Johnson was operating the vehicle.

[8] On cross-exam, Sgt. Kashner was asked questions about not having any of the shake tested or having Johnson's blood drawn to test for the presence of marijuana. The determination of whether reasonable suspicion or probable cause existed depends on the facts as the officer knew them at the time of the warrantless search. *State v. Chandler*, 132 A.3d 133, 144 (Del. Super. 2015) ("The reasonableness of official suspicion must be measured by what the officer knew *before* they seized

8

Sgt. Kashner testified that because Johnson was unable to produce a valid insurance card, the vehicle would have been towed and pursuant to department procedures, an inventory search would have been conducted wherein contents would have been documented. As the investigating officer, Sgt. Kashner would be the person to make the determination to tow the car. An inventory search would have been done before the tow truck took the vehicle.

On cross-exam, Sgt. Kashner testified that he did not ask Johnson whether he could locate the insurance information *via* his phone. In Sgt. Kashner's view, it was Johnson's decision as to how he was going to provide proof of insurance. The officer testified that he did not have to allow Johnson "to exhaust all options" of producing proof of insurance.

## III. *The parties' contentions*

### A. *Defendant's motion*

Johnson seeks to suppress all evidence seized and all statements made as a result of the alleged illegal detention and search. Johnson's Motion does not identify any defects in the search or why probable cause did not exist. Rather, he argues that the State has the burden to prove by a preponderance of the evidence that probable

---

the defendant."). Thus, whether Sgt. Kashner could have taken other steps is not relevant to the analysis.

9

cause to conduct the search existed. Johnson asserts in a conclusory manner, that the State could not meet its burden.

### B. *The State's response to the Motion*

The State's response argues this is not a "close case,"[9] as the defendant suggests. Sgt. Kashner had probable cause to stop Johnson based on (1) driving on the wrong side of the road; (2) after-market window tint without a tint waiver; and (3) the "stop code."[10] The State argues that the stop was not extended, but to the extent that it was, "independent probable cause" existed to search the car based on "the odor of marijuana in a vehicle and a lack of insurance."[11] The State also argues that if probable cause did not exist, under the inevitable discovery exception, the contents of the vehicle would have been discovered during an inventory search.

As discussed below, the parties' arguments shifted a bit at the hearing.

## IV. *Standard of review*

A defendant may move to suppress evidence under Superior Court Criminal Rule 12(b)(2). In this context, the Court determines the facts from the testimony and physical and documentary evidence, as well as inferences drawn therefrom.[12] A warrantless search is presumed to be unreasonable.[13] Thus, the State bears the

---

[9] D.I. 16, ¶ 19.
[10] D.I. 16.
[11] *Id.* at ¶ 17.
[12] *State v. Queen*, 2023 WL 4881241, at *3 (Del. Super. July 31, 2023); *State v. Kent*, 2022 WL 5419653, at *4 (Del. Super. Oct. 7, 2022).
[13] *Juliano v. State*, 260 A.3d 619 (Del. 2021).

burden to prove by a preponderance of the evidence that the search was within constitutional limits.[14]  Accordingly, the State must prove that the officer "had a particularized and objective basis" to suspect legal wrongdoing.[15]

## A.    *A warrantless search*

The Fourth Amendment of the United States Constitution and Article I, Section 6, of the Delaware Constitution, protect against unreasonable searches and seizures.[16]  When an officer executes a traffic stop, he/she temporarily seizes the individual as well as the vehicle.[17]  Consequently, the seizure is subject to constitutional limits.[18]  First, the stop itself "must be justified at its inception by reasonable suspicion of criminal activity."[19]  Second, "the scope and duration of the detention must be reasonably related to the initial justification for the stop."[20]  An officer may inquire about the driver's identity, his/her destination, and the reason for

---

[14] *Id.* at 626.

[15] *Id.* (citing *Bradley v. State*, 976 A.2d 170, 2009 WL 2244455, at *3 (Del. July 27, 2009) (TABLE) ("[T]he totality of the circumstances must indicate that the detaining officer had a particularized and objective basis for suspecting legal wrongdoing." (alterations omitted) (quoting *Sierra v. State*, 958 A.2d 825, 828 (Del. 2008))); *see also State v. DuBose*, 2016 WL 1590583, at *3 (Del. Super. Apr. 18, 2016) ("The burden of proof on a motion to suppress is proof by a preponderance of the evidence."), *aff'd*, 152 A.3d 582, 2016 WL 7212307 (Del. Dec. 12, 2016) (TABLE).

[16] *Pollard v. State*, 284 A.3d 41, 46 (Del. 2022).

[17] *State v. Winn*, 2006 WL 2052678, at *3 (Del. Super. July 3, 2006) (citing *Caldwell v. State*, 780 A.2d 1037, 1045 (Del. 2001)); *State v. Medina*, 2020 WL 104323, at *4 (Del. Super. Jan. 7, 2020) ("A police officer who observes a traffic violation has probable cause to stop the vehicle and its driver." (citation omitted)).

[18] *Id.*

[19] *Caldwell*, 780 A.2d at 1046.

[20] *Chandler*, 132 A.3d at 140 (citing *Holden v. State*, 23 A.3d 843, 847 (Del. 2011)).

the trip.[21] Additional inquiries into matters unrelated to the reason for the initial stop do not "convert the encounter into something other than a lawful seizure, so long as those inquires do not measurably extend the duration of the traffic stop."[22] Thus, "an officer is not entitled 'to conduct an unrelated criminal investigation absent some other criminal suspicion.'"[23]

"Any investigation of the vehicle or its occupants beyond that required to complete the purpose of the traffic stop constitutes a separate seizure that must be supported by independent facts sufficient to justify the additional intrusion."[24]

Reasonable suspicion, which must be based on more than a hunch, is defined as "an officer's ability to point to specific and articulable facts which taken together with rational inferences from those facts, reasonably warrant the intrusion."[25] "Reasonable suspicion" must be viewed in the context of the totality of the

---

[21] *Id.* at 142 (citing 11 *Del. C.* § 1902).

[22] *Murray v. State*, 45 A.3d 670, 674-75 (Del. 2012) (citation omitted) ("For something to be measurable, it need not be large[.]"); *Chandler*, 132 A.3d at 143 (determination of whether a stop has been measurably extended is necessarily a fact-intensive inquiry).

[23] *Chandler*, 132 A.3d at 142 (quoting *Jenkins v. State*, 970 A.2d 154, 158 (Del. 2009)).

[24] *Id.* at 140-41 (citations omitted) ("The second detention is unconstitutional unless it is based on specific and articulable facts which, take together with all rational inferences, raised an objective suspicion of criminal behavior."); *Murray*, 45 A.3d at 676 (citation omitted) (the extension of the detention must be based on a reasonable suspicion of some illegal activity); *McDougal v. State*, 2024 WL 12070606, at *4, __ A.3d ___ (Del. Mar. 21, 2024) ("A classic formulation of the rule is that 'law enforcement officers may stop or detain an individual for investigatory purposes, but only if the officer has reasonable articulable suspicion to believe the individual detained is committing, has committed, or is about to commit a crime.'").

[25] *Chandler*, 132 A.3d at 141 (quoting *Holden*, 23 A.3d at 847 (Del. 2011)); *State v. Rose*, 2022 WL 2387803, at *4 (Del. Super. Mar. 11, 2022) ("Reasonable suspicion is a 'less demanding' standard than probable cause and requires a showing considerably less than proof by a preponderance of the evidence.").

12

circumstances and "through the eyes of a reasonable, trained police officer in the same or similar circumstances, combining objective facts with such an officer's subjective interpretation of those facts."[26] The Court will review the facts under an objective standard and thus, the police officer's subjective opinion of suspicious circumstances is not sufficient.[27]

A vehicle may be searched without a warrant if "'the police have probable cause to believe that an automobile is carrying contraband or evidence' of criminal activity."[28] "Under the automobile exception, if police have probable cause to search a vehicle, they may search every part of the vehicle and its contents that may conceal the objects of the search."[29]

**B.    *The inevitable discovery exception to the exclusionary rule***

The exclusionary rule, "a remedy for a violation of a defendant's right to be free of illegal searches and seizures," requires the exclusion of any evidence obtained through an illegal search and seizure.[30] Under the inevitable discovery exception, long recognized in Delaware, evidence obtained through an illegal search "will not be suppressed if the prosecution can prove that the incriminating evidence

---

[26] *Chandler*, 132 A.3d at 141.
[27] *Id.*; *Rose*, 2022 WL 2387803, at *4 (reasonable suspicion requires "something more than an officer's inchoate, vague suspicion.").
[28] *Pollard*, 284 A.3d at 46 (citation omitted).
[29] *Medina*, 2020 WL 104323, at *10.
[30] *Jones v. State*, 745 A.2d 856, 872 (Del. 1999).

13

would have been discovered through legitimate means in the absence of official misconduct."[31]

## V.     *Discussion*

### A.     *Was the initial stop valid?*

Johnson does not contest that Sgt. Kashner had authority to validly stop the Honda Accord based on the stop code. At the hearing, he challenged whether there was reasonable suspicion to stop the car based on the window tint and the alleged improper lane change.

#### i.     *Did Sgt. Kashner have reasonable suspicion to stop the vehicle for improper window tint?*

Johnson is alleged to have violated 21 *Del. C.* § 4313. This provision references Federal Motor Vehicle Safety Standard 205. On cross-examination, Sgt. Kashner admitted he did not know the requirements of the federal standard. Based on this acknowledgement and relying on *McDougal v. State*,[32] Johnson argues that because Sgt. Kashner did not know the law, he could not have had reasonable suspicion of a violation of the statute. In *McDougal*, the Supreme Court found that because the officer did not have "a firm grasp of the conduct that constitutes loitering" and because the actions of the defendant did not constitute loitering, the

---

[31] *State v. Parks*, 95 A.2d 42, 51 (Del. Super. 2014) (cleaned up); *Cook v. State*, 374 A.2d 264, 267-68 (Del. 1977) (Delaware Supreme Court approving the inevitable discovery exception).
[32] 2024 WL 12070606, __ A.3d __ (Del. Mar. 21, 2024).

14

officer did not have reasonable suspicion of a crime and therefore, the initial detention (based on alleged loitering) was unconstitutional.

Johnson's reliance on *McDougal* is misplaced. In *McDougal*, the Supreme Court found that there were no facts supporting a violation of the loitering statute and therefore, the officer "could not have *reasonably* suspected McDougal was loitering under … the loitering statute."[33] As discussed below, even though Sgt. Kashner did not have knowledge of the federal regulations, he had reasonable suspicion of a violation of the window tint statute.

"The window tint law in Delaware is not straightforward…."[34] Section 4313(a) provides:

> No person shall operate any motor vehicle on any public highway, road or street with the front windshield, the side windows to the immediate right and left of the driver and/or side wings forward of and to the left and right of the driver that do not meet the requirements of Federal Motor Vehicle Safety Standard 205 in effect at the time of its manufacture.[35]

This section incorporates a federal safety standard that "is virtually incomprehensible [and] is almost impossible to identify the point at which after-market tinting becomes excessive."[36] Because the federal regulation was so

---

[33] 2024 WL 12070606, at *8.

[34] *State v. Moore*, 2017 WL 1040709, at *2 (Del. Super. Mar. 16, 2017).

[35] 21 *Del. C.* § 4313(a). A waiver of this provision may be granted for medical necessity. 21 *Del. C.* § 4313(d).

[36] *Moore*, 2017 WL 1040709, at *2 (cleaned up) (quoting *State v. Wilson*, 2013 WL 2423093, at *2 (Del. Super. Mar. 12, 2013)).

15

unwieldly, the Delaware Department of Transportation promulgated 2 *Del. Admin. C.* § 2277, which provides a definitive method to determine whether tinting is at an acceptable level and "assists police officers in enforcing the law by clarifying that window tint 'must provide [] light transmission of not less than 70 percent.'"[37]

While an officer observing a vehicle with tinted windows will likely not know the exact percentage of light transmission, this Court has previously found that when the tint was so dark that the officer could not see inside the vehicle or identify the number of occupants, reasonable suspicion existed that the standard has been violated.[38]

Sgt. Kashner observed a 2004 Honda Accord with heavily tinted windows. He testified that the tint was so dark that he could not determine the number of occupants inside the vehicle and that is why he directed the driver to roll down the windows at the outset of the stop. He had also checked the vehicle's registration before he executed the stop and learned that the vehicle did not have a window tint waiver. As found in *Trower*, *Moore*, and *Cannon* (among other cases), this is

---

[37] *Id.* (quoting 2 *Del. Admin. C.* § 2277-3.1.2.).

[38] *State v. Trower*, 931 A.2d 456, 459 (Del. Super. 2007) ("I find that window tint which is so dark that one cannot see the occupants inside the vehicle creates a reasonable suspicion that it violates the standard."); *Moore*, 2017 WL 1040709, at *2 (finding reasonable suspicion where officer testified that the tint was so dark that he could not see the occupants and he verified that the vehicle did not have a medical waiver); *State v. Cannon*, 2017 WL 1277677, at *4 (Del. Super. Mar. 30, 2017) (same); *State v. Morris*, 2019 WL 262403, at *4 (Del. Super. Jan. 17, 2019) (same).

sufficient for Sgt. Kashner to have reasonable suspicion of a window tint violation. Thus, a possible violation of the window tint statute was a valid basis for the stop.

**ii.**      ***Did Sgt. Kashner have reasonable suspicion to stop the vehicle for improper passing?***

At the hearing, Johnson argued that passing the truck by entering the left lane of traffic was not a violation of 21 *Del. C.* § 4114, and therefore, Sgt. Kashner did not have reasonable suspicion to stop the vehicle.

Section 4114(a) provides, in relevant part:

> Upon all roadways of sufficient width a vehicle shall be driven upon the right half of the roadway, except as follows:
>
> (1) When overtaking and passing another vehicle proceeding in the same direction *under the rules governing such movement*;
>
> (2) When an obstruction exists making it necessary to drive to the left of the center of the highway; provided, any person so doing shall yield the right-of-way to all vehicles traveling in the proper direction upon the unobstructed portion of the highway within such distance as to constitute an immediate hazard;[39]

Johnson argues that he was permitted to cross the center of the road because he was passing another vehicle, as permitted in subsection (1), or alternatively, the truck was an obstruction, which allowed him to pass on the left under subsection (2).

The rules governing passing a vehicle proceeding in the same direction are found in 21 *Del. C.* § 4116, which provides, in part:

---

[39] 21 *Del. C.* § 4114 (emphasis added).

(2) On a roadway with only 1 travel lane proceeding in a given direction and where that travel lane is too narrow for an overtaking vehicle to travel safely side-by-side within the lane with the overtaken vehicle or bicycle, the driver of the overtaking vehicle shall move completely into the lane to the left before passing. The driver of the overtaking vehicle shall only make this movement if it can be accomplished while obeying the limitations described in §§ 4118 through 4120 of this title.

Section 4118 requires that before overtaking another vehicle on the left, the left side must be clearly visible and free from oncoming traffic. Section 4119 prohibits passing on the left under specified road conditions, such as when approaching a curve, an intersection, or a railroad grade. Section 4120 addresses no-passing zones.

The alleged traffic violation was not captured on the BWC. Thus, the only evidence of the violation came from Sgt. Kashner's testimony. The BWC video shows Sgt. Kashner telling Johnson that he was driving on the wrong side of the road when he passed the truck. At the hearing, Sgt. Kashner testified Johnson improperly passed the truck by going on the left side of the road but did not testify why such action was improper. Stated differently, there was no evidence offered at the hearing that passing on the left was not permitted under the rules allowing of passing on the left. While the basis for the challenge to the traffic violation was first raised at the suppression hearing, it is the State's burden to prove that there was a reasonable basis to believe that the statute had been violated. The State did not do so here. Instead, it relied on the conclusory statement of Sgt. Kashner. Thus, the State has

18

not carried its burden to show that there was reasonable suspicion that the Honda Accord improperly passed on the left. Accordingly, the allege traffic violation was not a valid basis for the stop.

### B. *Was the initial detention extended?*

The State argues that the initial detention was not extended, thus there was only one seizure.[40] The State further argues that to the extent the stop was extended, Johnson is to fault because he could not produce a valid insurance card.[41]

Johnson argued at the hearing that the stop was extended by an investigation relating to marijuana. Among other things, Johnson asserted that Sgt. Kashner's failure to investigate the stop code while at the scene and failure to investigate whether Johnson had a criminal record (or any other record inquiry) shows that a further detention occurred. Johnson also argued that after Sgt. Kashner closed the door on Johnson in the back seat of the police cruiser, the first thing he did was grab the blue gloves to prepare to search the vehicle, which was inconsistent with the argument that the stop had not been extended.

An investigation beyond the purpose of the traffic stop constitutes a separate seizure.[42] Here, it is clear that Sgt. Kashner detained Johnson for reasons other than the stop code, window tint, or the alleged traffic violation. Indeed, Sgt. Kashner

---

[40] D.I. 16, ¶ 17.
[41] *Id.*
[42] *Murray*, 45 A.3d at 673-74.

testified at the hearing that Johnson was being detained when he was placed in the back of the police cruiser to allow Sgt. Kashner to investigate a possible crime relating to marijuana. This is clearly beyond the scope of the basis for the initial stop. Thus, a second seizure occurred.

### C. *Did Kashner have probable cause to search the vehicle?*

The State contends that Sgt. Kashner had reasonable suspicion of the crimes of possession of marijuana by a person under 21 and/or consumption of marijuana while operating a motor vehicle, in violation of 16 *Del. C.* § 4764.

It was clear from the BWC video and Sgt. Kashner's testimony that he believed that mere possession of marijuana by a person under 21 was a criminal offense. The State argued that it was illegal for Johnson to have marijuana, whether he smoked it or possessed it, because he was under 21. However, since 2015 when the General Assembly decriminalized possession of small amounts of marijuana, mere possession is no longer a crime.[43] Further, in April 2023 (over three months before this traffic stop), possession of personal use amounts became legal. As amended in 2023, Section 4764(c) provides, in relevant part:

> A person under 21 years of age who knowingly or intentionally possesses, uses, or consumes a personal use quantity of a controlled substance … classified in § 4714(d)(19) of this title, must be assessed a civil penalty of $100 for a first violation of this subsection and a civil penalty of not less than $200 nor more than $500 for a second violation of this subsection and is guilty

---

[43] *Rose*, 2022 WL 2387803, at *5.

of an unclassified misdemeanor and must be fined $100 for a third or subsequent violation of this subsection.[44]

Thus, a person under 21 possessing a personal-use quantity of marijuana is subject to a civil penalty. A person under 21 possessing a personal-use quantity of marijuana is not subject to criminal liability until the third violation, when it becomes an unclassified misdemeanor.

At the hearing, the Court *sua sponte* raised the questioned of what impact, if any, the 2023 amendment to Section 4764 had on the State's possession argument. That is, if possession of a small quantity of marijuana by a person under 21 does not subject the person to criminal liability unless it is a third offense (of which there was no evidence offered at the hearing), what criminal activity could Sgt. Kashner have reasonably suspected?[45]

The State did not provide a basis for an investigation for possession of marijuana under the statute as amended in 2023. Ultimately, the State abandoned this ground to justify the warrantless search.

Thus, the only possible crime Sgt. Kashner could have been investigating is the consumption of marijuana in a moving vehicle, under Section 4764(d). Use or

---

[44] 16 *Del. C.* § 4764(c).
[45] The Court offered the State the option to file a supplemental submission on the issue.

consumption in a moving vehicle, by a person of any age, remains an unclassified misdemeanor, even after the 2023 amendments legalizing marijuana.[46]

Johnson argued that there was an insufficient factual basis to support reasonable suspicion that he was consuming marijuana while operating the vehicle. He asserted that Sgt. Kashner was speculating that Johnson used marijuana while operating the car, which is not a valid basis to conduct a search.

"After *Juliano [v. State]*, the State must articulate something more than a vague description of marijuana in order to carry its burden of establishing probable cause for [a] … warrantless vehicle search."[47] Here, in addition to the odor,[48] Johnson was the only occupant of the vehicle, he admitted that he smoked marijuana, and said that there was probably a roach in the car. While a close call, taken together, this was a sufficient basis for Sgt. Kashner to have reasonably suspected that the car contained contraband or evidence of criminal activity, including consumption in a moving vehicle. This is also consistent with the holding in (i) *Milner v. State*,[49]

---

[46] *Milner v. State*, 2024 WL 853694, at *4, n.23 (Del. Feb. 28, 2024); 16 *Del. C.* § 4764(d) provides:

> Any person who knowingly or intentionally uses or consumes up to a personal use quantity of a controlled substance or a counterfeit controlled substance classified in § 4714(d)(19) of this title in an area accessible to the public or in a moving vehicle, except as otherwise authorized by this chapter, shall be guilty of an unclassified misdemeanor and be fined not more than $200, imprisoned not more than 5 days, or both.

[47] *Rose*, 2022 WL 2387803, at *6.
[48] *Valentine v. State*, 207 A.3d 166, 2019 WL 1178765 (Del. Mar. 12, 2019) (TABLE) ("That possession of personal uses of marijuana is not a criminal offense does not render marijuana oders, raw or burnt, irrelevant to determinations of probable cause.").
[49] 2024 WL 853694, at *5.

(finding probable cause of a violations of 4764(d) for a search of the vehicle based on smell of marijuana, the driver being the sole occupant, a dialog regarding the smell, and the driver only slightly opening the window when the officer approached); (ii) *Pollard v. State*,[50] (finding probable cause of a violation of 4764(d) based on smell of marijuana, observing marijuana remnants in the console, and observing a small nugget in the console); and (iii) *Willingham v. State*,[51] (finding probable cause to believe that the vehicle contained contraband or criminal activity, including consumption in a moving vehicle, based on the smell of marijuana emanating from the car in which the defendant was the sole occupant, observing a blunt in the console, and the defendant admitting that marijuana was in the car.).

**D.** ***Does the inevitable discovery exception apply?[52]***

The State argues that because Johnson did not produce proof of insurance at the time he was stopped, the vehicle would have been towed and an inventory search would have been conducted, through which the gun and other evidence would have been discovered. Therefore, even if the search was improper, under the inevitable discovery exception, the Motion should be denied. At the hearing, the State argued

---

[50] 284 A.3d 41.

[51] 297 A.3d 287, 2022 WL 3144218 (Del. Apr. 27, 2023) (TABLE).

[52] The Court has determined that probable cause existed to search the vehicle. Thus, this part of the analysis is included for completeness.

23

that the search captured on the BWC video was both an inventory search and a probable cause search.

An inventory search is a warrantless search that does not offend the protections of the Fourth Amendment because the officer conducting the search is left with no discretion to determine the scope of the search.[53] The absence of discretion ensures that the search will not be used as a means to search for evidence of a crime.[54] The State bears the burden to prove "that the police followed standardized procedures and acted in good faith in conducting an inventory search,"[55] which is not a pretext for investigative motives.[56]

The purpose of an inventory search is to "(1) protect the owner from theft or damage to the vehicle is while under police control; (2) protect police from false claims; and (3) protect the police from danger."[57]

The search conducted by Sgt. Kashner could have been both an investigative search and an inventory search because, as noted, an inventory search cannot be for the purpose of discovering evidence. It was clear from the officer's statements,

---

[53] *State v. Deputy*, 2001 WL 1729120, at *2 (Del. Super. Dec. 20, 2001).
[54] *Id.*
[55] *Id.*
[56] *State v. Frost*, 2019 WL 2285736, at *11 (Del. Super. May 28, 2019); *State v. Brownell*, 2005 WL 268043, at *1 (Del. Super. Jan. 28, 2005) ("The State has the burden to show that the inventory search was conducted in good faith in 'furtherance of the police caretaking function and not as a pretext for an investigatory motive.'" (citation omitted)).
[57] *Frost*, 2019 WL 2285736, at *11.

actions, and testimony, that the intent of the search was to uncover evidence. Thus, it could not have been an inventory search.

Therefore, the Court must consider if an inventory search had been conducted, would the evidence have been discovered. It is the State's burden to prove that the inevitable discovery exception applies.[58]

Here, Sgt. Kashner testified in a conclusory fashion that it was police policy to conduct an inventory search when proof of insurance is not provided. He further testified that the search is conducted before the tow truck arrives at the scene and items are documented. But Sgt. Kashner provided no further evidence of policy or how searches are conducted. The policy was not introduced into evidence and Sgt. Kashner did not testify about how a search is conducted, what property is to be inventoried and how, or that he was trained in conducting such searches.[59] Accordingly, the State failed to prove that the inevitable discovery exception applies.

## VI.    *Conclusion*

Sgt. Kashner had reasonable suspicion of a violation of the window tint statute and the vehicle was identified with a valid stop code. Therefore, the initial stop was valid. Because the detention of Johnson was for purposes beyond the basis for the

---

[58] The defense first raised *State v. Frost* at the suppression hearing. The Court offered the State the opportunity to file a supplemental pleading to address the arguments based on *Frost*, but the State declined the offer.

[59] *See Frost*, 2019 WL 2285736, at *13. While counsel described how an inventory search is conducted, counsel's arguments are not evidence.

initial stop, a second detention occurred.  Based on the totality of the circumstances, probable cause existed to search the vehicle.  Accordingly, the Motion to Suppress is DENIED.

IT IS SO ORDERED.

/s/Kathleen M. Miller
Judge Kathleen M. Miller